UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

C.S., *Individually and on behalf of M.S., a child with a disability*,

                             Plaintiff,

     v.

YORKTOWN CENTRAL SCHOOL DISTRICT,

                           Defendant.

No. 16-CV-9950 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Kerry M. McGrath, Esq.
Jason H. Sterne, Esq.
Cuddy Law Firm, PLLC
White Plains, NY
*Counsel for Plaintiff*

Mark. C. Rushfield, Esq.
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

       Plaintiff C.S. ("Plaintiff") brought this Action individually and on behalf of her daughter,

M.S., against the Yorktown Central School District ("Defendant" or "the District") under the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.  (*See* Compl.

(Dkt. No. 1).)[1]  The dispute arises out of the decisions of the Independent Hearing Officer

("IHO") and the State Review Officer ("SRO") who adjudicated Plaintiff's administrative claims

---

[1] Plaintiff is M.S.'s mother.  However, for ease of reference, the Court will use "Plaintiff" when referring to M.S.'s parents throughout this Opinion.

for relief arising out of Defendant's alleged failure to provide M.S. a free and appropriate public education ("FAPE") during the 2013-2014, 2014-2015, and 2015-2016 school years. Before the Court is Plaintiff's Motion for Summary Judgment. (Notice of Mot. For Summ. J. (Dkt. No. 11).) For the following reasons, the Motion is denied.

## I. Background

### A. Factual Background[2]

M.S. is a child with a disability as defined by the IDEA. (Pl.'s Local Rule 56.1 Statement ("Pl.'s 56.1") ¶ 2 (Dkt. No. 14)). M.S. has been diagnosed with at least Attention Deficit Hyper Activity Disorder (ADHD), Developmental Coordination Disorder, and Tourette's Syndrome. (*Id.* ¶ 5.) M.S. attended school in the District for kindergarten (2009-10) through fifth grade (2014-15). (Pl.'s Ex. K-1; Pl.'s Ex. R-2.)[3]

#### 1. M.S.'s Educational History

M.S. began receiving special education interventions—including speech/language services and small group support services—in preschool. (Pl.'s Ex. J-1–J-2; Transcript of IHO Hearing ("Tr.") 45.) When she transitioned to kindergarten for the 2009-10 school year, M.S. was declassified from special education and placed in a general education program, which she remained in through second grade, the 2011-12 school year. (Pl.'s Ex. J -1; Tr. 46–47.) During that time, M.S. received "building level" services, including small group reading and math services and occupational therapy, which do not require an individualized education program ("IEP"). (Tr. 69, 94, 1910.)

---

[2] When the Court cites to one of the Parties' Rule 56.1 Statements, that fact is undisputed.

[3] The entire administrative record, including Plaintiff's exhibits, Defendant's exhibits, and the IHO's exhibits, were provided to the Court in hard copy. The Court will cite to each separately, although they are all included in one large document.

In July 2010, before first grade, Plaintiff obtained a private neuropsychological consultation from Dr. Monica McQuaid, who diagnosed M.S. with ADHD and a Developmental Coordination Disorder and noted that M.S.'s "profile places her at risk for a language-based disorder, as well as a learning disorder." (Pl.'s Ex. J-11.)[4] During M.S.'s second grade, she was referred to the District's Committee on Special Education ("CSE") for evaluation of a suspected disability. (Def.'s Local Rule 56.1 Statement ("Def.'s 56.1") ¶ 1.) As part of that process, M.S. was referred for a psychological evaluation by Denise Sandor, Psy.D., the school psychologist, in March 2012. (Pl.'s Ex. K-1.) The evaluation concluded that M.S. "demonstrates significant weaknesses in language functioning," which are "significantly deflating her overall IQ score making a generalization of her cognitive ability difficult to estimate." (*Id.* at K-5.) Further, Dr. Sandor noted that M.S. "is continuing to exhibit several behaviors related to attention difficulties, impulsivity, difficulties with executive functioning and social difficulties." (*Id.*) She therefore "recommended that the [CSE] consider [M.S.] for special education services" and implement "accommodations and modifications appropriate for children diagnosed with ADHD." (*Id.* at K-5–K-6.)

At a CSE meeting held in May 2012, M.S. was deemed eligible and classified as a student with a learning disability. (Def.'s 56.1 ¶ 1.) Her 2012-13 IEP recommended integrated co-teaching ("ICT") services to support her in the regular classroom. (Pl.'s Ex. B-4, B-7.)[5] It

---

[4] Plaintiff alleges that she provided this report to the District, but it did not immediately evaluate M.S. (Pl.'s Mem. 2.) However, the cited portions of the record do not clearly show *what* was provided to the District and *when* it was provided. (*See* Ex. K; Tr. 69, 80.)

[5] "[I]integrated co-teaching services . . . [are] a placement somewhere in between a regular classroom and a segregated, special education classroom." *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 144 (2d Cir. 2013); *see also* 8 N.Y.C.R.R. § 200.6(g) ("Integrated co-teaching services means the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students.").

also noted that M.S. had "[b]orderline range" cognitive skills, some math deficiencies, and "[k]indergarten level" reading skills. (*Id.* at B-3–B-4.) In July 2012, the District conducted a speech and language evaluation of M.S. (Pl.'s Ex. L.) After administering several tests, (*see id.* at L-1–L-5), the evaluator noted that "[i]n light of the average scores obtained and [M.S.'s] placement in an ICT class for grade three, speech/language therapy is not indicated at this time," (*id.* at L-7.) Therefore, M.S.'s IEP for third grade, the 2012-13 school year, again recommended ICT services. (Pl.'s Ex. C-7.) She also received building level occupational therapy. (Tr. 87.)

On March 14, 2013, the CSE met to develop M.S.'s IEP for fourth grade—the 2013-14 school year. (Pl.'s Ex. D.) It noted that M.S. "has a hard time solving basic math facts and working on word problems," "struggles in reading," including comprehension and fluency, and "requires a lot of teacher support when working on a writing activity," including spelling and mechanics. (*Id.* at D-3.) The CSE therefore set forth eleven annual goals for reading, writing, mathematics, and motor skills. (*Id.* at D-5–D-6.) The IEP recommended that M.S. continue ICT services for social studies and science class, but attend a special 12:1+1 class for reading, math, and skills. (*Id.* at D-7.) It also recommended 5:1 small group occupational therapy twice a week, as well as supplementary aids for the classroom. (*Id.*) M.S. also began attending a building level social skills group mid-year. (Tr. 921–23; Pl.'s Ex. JJ-3.)[6]

---

[6] Before M.S. began attending this social skills group, she reported to her parents that she was being bullied. Specifically, M.S. claimed that she regularly wet her pants in school because, if she went to the bathroom when needed and arrived late to lunch or recess, she would not have classmates to sit with. (Tr. 1902–05.) Plaintiff informed the nurse, who suggested a meeting with M.S.'s teachers. (*Id.* at 1903.) Although they held a meeting with teachers in the spring, the District did not convene a CSE meeting to review this issue. (*Id.* at 1903–04.) Following the meeting, and into the 2014-15 school year, M.S. continued to be bullied, including on the bus, and was teased for her Tourette's syndrome. (*Id.* at 1906–07, 1910–11.)

Toward the end of fourth grade, in March 2014, Plaintiff had M.S. privately evaluated for auditory-language processing. (Def.'s 56.1 ¶ 4; Pl.'s Ex. N.) After conducting several tests, (Pl.'s Ex. N-2–N-3), the evaluator noted that M.S. "is now seen as struggling with listening skills that impact language abilities," most significantly with respect to "Auditory Reasoning ability." (*Id.* at N-7.) The evaluator therefore "strongly recommended that [M.S.] receive speech and language therapy to focus on listening-language skills." (*Id.*) Plaintiff provided the results of this evaluation to the CSE at M.S.'s May 8, 2014 annual review meeting. (Def.'s 56.1 ¶ 4.) The CSE "agreed to request a speech/language evaluation" and decided to "reconvene in June 2014 to review all of the[] findings and discuss recommendations." (Pl.'s Ex. F-1; *see also* Pl.'s Resp. to Def.'s 56.1 ("Pl.'s Resp. 56.1") (Dkt. No. 21) ¶ 5 ("The District told the Parent it needed to conduct its own speech evaluation.").) The District conducted a speech and language evaluation on May 20 and 23, 2014. (Pl.'s Ex. O-1.) The evaluator recommended "[s]peech and language therapy" that "should focus on [M.S.'s] ability to define words, follow directions, apply syntactic skills and improve listening comprehension." (*Id.* at O-5.) The CSE reconvened on June 12, 2014 to discuss these results, and added small group speech-language therapy to M.S.'s 2014-15 IEP. (Pl.'s Ex. E-1, E-6, E-11.)

The CSE's recommendation for M.S.'s fifth grade IEP was thus (1) the special 12:1+1 class for reading, mathematics, social studies, science, and language arts, with modifications and accommodations, as well as assistive technology in the form of adaptive seating and a personal FM system for auditory use; (2) 30 minutes of speech/language therapy three times a week (5:1 twice a week, 2:1 once a week); and (3) 30 minutes of 5:1 occupational therapy twice a week. (*Id.* at E-1, E-10–E-12.) In formulating these recommendations, the CSE noted that M.S. "has shown tremendous growth in her reading abilities throughout her fourth grade school year,"

reflected in her increased confidence, "satisfactory listening skills," and an increase in her "progress monitoring scores," but "she still falls well below the benchmark for fourth grade" and thus needs "consistent monitored practice in fluency and reading comprehension." (*Id.* at E-5.) It also noted her continued difficulties with math and "substantial problems with various aspects of language." (*Id.* at E-6.) And, the CSE found that there were "no social and emotional needs that should be addressed through special education at this time." (*Id.* at E-7.) In addition to her IEP, M.S. received building level services for additional reading support and counseling during the 2014-15 fifth grade year. (Def.'s 56.1 ¶ 9.) This included multisensory instruction in reading. (Tr. 787-89, 827–28, 830–35.)[7]

In late 2014, the District conducted a state-mandated psycho-educational re-evaluation of M.S. (Pl.'s Ex. JJ.) After performing several tests and making behavioral observations, the evaluator explained that M.S.'s "overall intellectual functioning is in the Low Average range," consistent with her previous score, her verbal comprehension and processing speed are also "Low Average," her perceptual reasoning is "Average," and her working memory is "Borderline." (*Id.* at JJ-12–JJ-13.) After noting some strengths, the evaluator noted "[r]elative weakness" in some cognitive capabilities, and "well below grade level" academic skills, including "weak" reading skills, "quite limited" math skills, and" difficult[ies] expressing thoughts through writing," as well as "difficulties with attention." (*Id.* at JJ-13.) The evaluator recommended that M.S. continue special education services, occupational and speech/language

---

[7] This testimony is all from Laura Basile, a Reading Specialist for the District who provided reading services to M.S. during a 2014 summer reading camp and as building level reading services during the 2014-15 school year. (IHO Decision 5–6.) The transcript incorrectly spells her name "Basili." (*See* Tr.)

therapy services, and social skills group, as well as her test accommodations and program modifications. (*Id.*)

On January 23, 2015, the CSE convened to review the results of the psycho-educational re-evaluation. (Pl.'s Ex. G-1.) Although no changes were made to M.S.'s instructional program, 5:1 small group counseling was added to her IEP as a "related service." (*Id.* at G-1, G-9; *see also* Tr. 1873–74 (adding counseling to IEP); *id.* at 1938–39 (parent's testimony that it was their "understanding" that M.S.'s IEP could not be changed at this meeting and had to wait until an annual review) The CSE meeting minutes also indicated that M.S. works with a reading specialist and that her social skills group, occupational therapy, and speech/language therapy should continue. (*Id.* at G-1.)

However, concerned that M.S.'s re-evaluation had not shown her progress, Plaintiff brought her to Dr. Nelson Dorta ("Dr. Dorta"), a pediatric neuropsychologist, for an evaluation. (Def.'s 56.1 ¶ 19; Pl.'s Ex. Q.) Dr. Dorta noted that M.S. "showed gross delays in all academic areas consistent with a Language Based Learning Disorder (LBLD)," including reading and math, that she "is not progressing" in terms of "upward movement of the percentile ranks in core academic areas," and indeed her math computation rank had declined. (Pl.'s Ex. Q-6.) Dr. Dorta found that "[t]he current data supports the IEP classification" and the current frequencies of intervention. (*Id.* at Q-7.) However, she recommended that M.S. also receive small group support in writing and math, each three times a week. (*Id.*) Finally, Dr. Dorta recommended "consider[ing] a school specifically designed for children with LBLD such as the . . . Eagle Hill School[]." (*Id.*)

The CSE met twice during M.S.'s fifth grade year—on April 30, 2015 and on May 22, 2015—to consider her IEP for sixth grade, the 2015-16 school year, which M.S. would complete

at the District middle school.  (Def.'s 56.1 ¶ 18.)  Plaintiff provided Dr. Dorta's report to the

CSE at both meetings, (*id.* ¶ 19), and Dr. Dorta participated via teleconference at the April

meeting to "review[] the results," (Pl.'s Ex. H-2; *see also* Tr. 1943 (Plaintiff testifying that Dr.

Dorta said on phone that "[M.S.]'s needs were very intense and that if there wasn't a drastic

change in the program, she would make little to no progress in school")).  In addition to

considering Dr. Dorta's evaluation, (*see* Pl.'s Ex. H-4–H-5), the CSE noted other aspects of

M.S.'s academic achievement, performance, and learning characteristics, (*see id.* at H-4–H-9).

Among other things, the CSE noted that M.S. "has made gradual progress toward her reading

goals," but she is still "in the at-risk category" for oral reading fluency, her "reading

comprehension skills are weak and need much support," specifically from teachers, and that

M.S. "benefits from a multisensory approach for phonics" and thus "should continue her

advanced phonics study integrating multi-sensory approach utilizing all modalities."  (*Id.* at H-

6.)  Further, the IEP stated that M.S. "has made satisfactory progress towards her math goals,"

but noted that "[t]he December psychoeducational re-evaluation indicated poor basic math

skills" and that M.S. "has considerable difficulty with basic facts, computation and problem

solving."  (*Id.* at H-7.)  It also found that M.S. "has made gradual progress toward her speech and

language goals this year," and in particular noted that "[h]er motivation and interest level in an

activity affect her participation.  (*id.*)

Plaintiff requested that the IEP include Orton-Gillingham based instruction—in other words, a specific research-based methodology.[8] (Tr. 1949–50, 1953–54.)[9] CSE Chairperson Michael Rosen informed Plaintiff that a multisensory approach would be used to instruct M.S. in reading, but the specific research-based multisensory approach—e.g., Orton-Gillingham versus another one—was not identified. (Tr. 891–97.) The CSE ultimately recommended an IEP for the 2015-16 school year including: (1) 12:1+1 special class in english, math, social studies, and science; (2) 5:1 special class for reading; (3) 12:1 special class for skills; (4) 5:1 small group weekly occupational therapy two times for 42 minutes and one time for 30 minutes; (5) 5:1 and 2:1 small group speech/language therapy, for 42 minutes two times and one time weekly, respectively; and (6) 5:1 small group counseling once a week for 42 minutes. (Pl.'s Ex. H-1.) The IEP also set forth 24 annual goals for M.S. (Ex. H-10–H-12.)

Plaintiff believed this 2015-16 IEP was largely the same as M.S.'s 2014-15 IEP. (Tr. 1956.) Thus, on August 5, 2015, Plaintiff informed the District that she disagreed with the CSE's recommendations. (Pl.'s Ex. R.) Plaintiff also provided notice that she intended to send M.S. to Eagle Hill School for sixth grade and would be seeking reimbursement from the District.

---

[8] Orton-Gillingham is an instructional approach that is multisensory, explicit, repetitive, and sequential. (Tr. 1371.) *See Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 384 n.12 (S.D.N.Y. 2006) ("Orton–Gillingham is a specialized, multisensory teaching method designed to educate students with dyslexia and other learning disabilities.")

[9] Plaintiff claims that Dr. Dorta recommended using Orton-Gillingham for M.S.'s small group. (Pl.'s Mem. 7.) However, this is not in her report. (*See* Pl.'s Ex. Q.) Nor do the cited transcript pages reflect this recommendation. (Tr. 1314, 1346–54.) Indeed, Dr. Dorta's testimony at one point seems to indicate that he does not recommend using "pure" Orton-Gillingham, although the meaning of this sentence is not clear from the transcript. (Tr. 1346 (testifying that his recommendation of a "hybrid model" meant "not using a pure—such as Orton-Gillingham—using a pure decoding model . . . So it's not—like for example, Orton-Gillingham wouldn't . . be an appropriate model to help her with her decoding skills and her oral fluency, but there is other models [sic] that show better promise given the nature of her reading comprehension difficulties.").)

(*Id.* at R-2.)  The District responded on August 14, 2015, indicating that Defendant would arrange for M.S.'s transportation to Eagle Hill School and stated that the recommended IEP "is reasonably calculated to confer [M.S.] with meaningful educational progress in the least restrictive environment of her neighborhood public school."  (Pl.'s Ex. S-1.)

### 2.  Due Process Complaint and IHO Decision

On December 18, 2015, Plaintiff filed a complaint requesting an impartial due process hearing under 20 U.S.C. § 1415.  (Pl.'s 56.1 ¶ 8.)  The due process complaint notice alleged that the District failed to provide M.S. with a FAPE when "it failed to develop a program to meet [her] needs for at least the 2014–2015 and 2015–2016 school years."  (Pl.'s Ex. A-7.)  Plaintiff alleged that this denial of FAPE was based on, but not limited to, the following factors:

> (1)  The district inappropriately declassified M.S. and refused to refer her for special education services when she transitioned to kindergarten;
> (2)  The District inappropriately recommended RTI services when it should have recommended and develop an IEP for M.S.;
> (3)  The District failed to appropriately evaluate the Student in all areas of suspected disability, including speech and language;
> (4)  The District failed to recommend an appropriate program for the 2014–15 school year that would allow M.S. to make meaningful progress and as a result, M.S. regressed;
> (5)  The District failed to recommend appropriate teaching methodologies for M.S., including research-based multisensory instruction, in the 2015–16 school year;
> (6)  The District failed to recommend appropriate goals with the research-based multisensory methodologies M.S. needed in the 2015–16 school year;
> (7)  The District failed to recommend appropriate related services for M.S., including "sufficient pull-out speech," in the 2015–16 school year;
> (8)  The District failed to address M.S.'s social and emotional needs from at least the 2013–14 school year to present, which subjected M.S. to bullying without sufficient support in her IEP;
> (9)  Overall, the District failed to develop an appropriate IEP, program, and placement uniquely tailored to M.S.'s needs, including insufficient reading instruction, individualized instruction, and social and emotional support.

(*Id.* at A-8–A-9; *see also* Def.'s 56.1 ¶ 24.)  Plaintiff requested reimbursement for Eagle Hill School tuition, services, transportation and fees for the 2015-16 school year and compensatory education in the form of research-based multisensory tutoring services.  (Pl.'s Ex. A-9–A-10.)

On December 22, 2015, James P. Walsh, Esq. was appointed as the IHO.  (Decl. of Kerry M. McGrath, Esq. in Supp. of Mot. for Summ. J. ("McGrath Decl.") (Dkt. No. 17) Ex. B ("IHO Decision").)  On March 14, 2016, the IHO issued an Interim Order holding that all claims preceding December 22, 2013 were time-barred.  (Def.'s 56.1 ¶ 25.)  The IHO then conducted 8 days of hearings, at which Defendant presented the testimony of 7 witnesses and 3 exhibits, and Plaintiff presented the testimony of 5 witnesses and 44 exhibits.  (IHO Decision 4–7.)  The IHO issued his decision on July 27, 2016.  (*Id.* at 28.)

The IHO first addressed Plaintiff's claims relating to M.S.'s fourth-grade year (2013–14). (*Id.* at 10–14.)  He found that Plaintiff's "Due Process Complaint contains no allegations against [the] District's programs or implementation, but only recitals of events addressing the 2013-14 school year."  (*Id.* at 10–11.)  While Plaintiff described events and discussions that occurred during the 2013-14 school year, they were all related to the program developed for the 2014-15 school year, "leaving no issue related to the 2013-2014 school year for review."  (*Id.* at 11.) However, for the portion of fourth grade falling within the statute of limitations—after December 22, 2013—the IHO addressed Plaintiff's "global assertion" that the "District failed to evaluate [M.S.] in all areas of suspected disability," despite evidence of speech and language issues since preschool.  (*Id.*)  Citing the speech/language evaluation completed on July 10, 2012, which did not recommend speech/language services, the IHO concluded that Plaintiff's allegation that the district failed to *evaluate* M.S. to be meritless.  (*Id.* at 11–12.)

Turning to Plaintiff's claims relating to M.S.'s fifth grade year (2014-15), the IHO found that the May 2014 IEP offered M.S. a FAPE. (*Id.* at 15–18.) In coming to this conclusion, the IHO reviewed the information before the CSE in May 2014, including Sandor's psychological report, (Pl.'s Ex. K), other "informational documentation that was dated in 2012 or before," and summaries of M.S.'s progress provided by staff, and the CSE's resulting recommendations. (IHO Decision 15–17.)[10] While noting that "more current assessment information would [have been] helpful" to the CSE, the IHO also cited Dr. Sandor's observation that M.S. had "failed to make progress" even with "the most intensive levels of support." (*Id.* at 16–17.) He therefore found the CSE's recommendation of moving M.S. to the 12:1+1 class for all of her core subjects would provide M.S. with "more intense, direct instruction," and thus was reasonably calculated to permit her to make educational progress. (*Id.*)

The IHO found that the District provided M.S. with "all of the services mandated by the provisions of her [IEP]" during the 2014-15 school year, and was "impressed by the enthusiasm with which the faculty at the school worked with [M.S.]." (*Id.* at 17.) However, the IHO concluded that the intended educational benefit from the 2014-15 IEP "was not realized." (*Id.* at 23.) He based this conclusion on the findings of private neuropsychologist Dr. Dorta and school psychologist Dr. Klein, which "established that [M.S.] was making little or no progress in her educational program." (*Id.*) In detailing the findings in these reports, the IHO noted that he "found Dr. Dorta's testimony forthright and fair" and that it "comported with the findings and conclusions made by Dr. Klein in her report." (*Id.* at 21.) Moreover, the IHO emphasized that Defendant had not provided M.S. with multisensory instruction, even though Dr. Dorta testified

---

[10] The IHO also noted that the CSE observed that M.S. "needs a multi-sensory approach to learning," which was not in the previous year's IEP, but that the IEP did not recommend provision of such an approach. (IHO Decision 16.)

that M.S. required it and the CSE continued that finding in the 2015-16 IEP. (*Id.* at 21, 23.) Thus, the new IEP's information regarding "certain areas of 'progress'" was "insufficient to establish any 'meaningful' progress or educational benefit" during the 2014-15 school year. (*Id.* at 23.) Finding that the 2015-16 IEP was "virtually identical" to the 2014-15 IEP, under which M.S. failed to make progress, the IHO concluded that it was not reasonably calculated to offer M.S. a meaningful educational benefit and thus, Defendant failed to offer M.S. a FAPE for the 2015-16 school year.[11] (*Id.*)

The IHO then considered the appropriateness of Plaintiff's unilateral placement of M.S. at Eagle Hill School for the 2015-16 school year. (*Id.* at 23–25.) Relying on the testimony of Tara Clancy, a literacy remediation expert and employee at Eagle Hill School, (Tr. 1184), regarding the school's facilities and programs, as well as Dr. Dorta's recommendation, the IHO concluded that the unilateral placement was reasonably calculated to provide M.S. with a meaningful educational benefit. (*Id.*) However, based on a re-evaluation conducted by Dr. Dorta in April 2016, the IHO also found that M.S. "made but little progress while at Eagle Hill School during the 2015-2016 school year" and thus, it would be "inappropriate for [Plaintiff] to consider further placement of [M.S.] at Eagle Hill School." (*Id.* at 25.) The IHO also found that equitable considerations favor an award of reimbursement for tuition paid to Eagle Hill for the 2015-16 school year—for $26,445.00. (*Id.* at 26.)

Finally, the IHO briefly addressed Plaintiff's remaining claims. First, the IHO "found that allegations that [the] District did not respond appropriately to allegations of bullying of

---

[11] The IHO noted one exception: the duration of the Related Service Therapy Sessions increased in the 2015-16 IEP. (IHO Decision 23.) However, the IHO stated that this "appears to have more relevancy to the schedules of the District's Middle School program than any intent to more seriously address [M.S.]'s deficits in those areas." (*Id.*)

[M.S.] to be totally without merit," because the alleged incidents "were quite properly and quite quickly addressed by District staff and never required any review by the [CSE]," and, in any event, there was no proof that such bullying "had any impact upon [M.S.'s] educational program." (*Id.* at 26–27.) Lastly, the IHO rejected Plaintiff's request for "an award of many hours of instruction by the Huntington Learning Center for alleged failure of [the] District to provide appropriate services and instruction to Student." (*Id.* at 27.) In denying this request, the IHO noted that Defendant continuously provided M.S. with intensive services and instruction, as did Eagle Hill School, but M.S. "failed to make progress," and therefore, "even with more hours of instruction . . . little, if any progress would have been realized." (*Id.*)

### 3. SRO Decision

On September 6, 2016, Defendant appealed, seeking to overturn the IHO's Determination that (1) it had failed to offer M.S. a FAPE for the 2015-16 school year, and (2) it must reimburse Plaintiff for the cost of Eagle Hill tuition. (McGrath Decl. Ex. A ("SRO Decision") 7–8.) Plaintiff answered and cross-appealed on September 14, 2016, arguing that the IHO erred by (1) not finding that Defendant had denied M.S. a FAPE for the 2013-14 or 2014-15 school years and (2) dismissing the request for compensatory educational services. (*Id.* at 8.) Neither Party appealed the IHO's finding that the statute of limitations barred any claims arising prior to December 22, 2013. (*Id.* at 11.) SRO Sarah L. Harrington issued a decision on October 6, 2016. (Pl.'s 56.1 ¶ 20.)

### a. 2013-14 School Year (Fourth Grade)

The SRO first addressed Plaintiff's claims relating to the 2013-14 school year. Plaintiff argued that the IHO failed to consider their claim that Defendant did not recommend speech-language services in the March 2013 IEP. (SRO Decision 11.) The SRO found this claim time-

barred, because the March 2013 IEP was developed before December 2013. (*Id.*) Further, the

SRO found that Plaintiff "did not assert a claim that the [D]istrict failed to implement the March

2013 IEP" in the due process complaint notice, because the IEP did not include a mandate for

speech-language services. (*Id.* at 11–12.) Rather, the SRO concluded that Plaintiff's actionable

claim amounted to an allegation that the CSE "should have revaluated the student's speech-

language needs and convened to recommend speech-language therapy after December 22, 2013

but before the . . . annual review for the 2014-15 school year." (*Id.* at 12.)

The SRO found no evidence showing that M.S. "exhibited speech-language needs that

would have required the [D]istrict to initiate an evaluation or provide remediation of [her]

speech-language needs" from December 2013 through the remainder of the 2013-14 school year.

(*Id.*) For the period prior to the statutory timeframe, the SRO noted that the July 2012 speech-

language evaluation yielded average formal test scores, to which a speech-language pathologist

testified, and did not recommend speech-language therapy, and that the March 2013 IEP did not

reflect any concerns about M.S.'s speech-language skills. (*Id.* at 12–13.) Indeed, although

subsequent evaluations revealed that M.S. "was experiencing some difficulty with language and

auditory processing," no evidence in the record suggested that M.S. "failed to progress toward

her IEP annual goals or otherwise exhibited difficulties in the classroom environment so as to

require the [D]istrict to initiate an evaluation of her speech-language skills." (*Id.* at 14–15.)

However, when Plaintiff expressed concerns about M.S.'s speech-language development, the

SRO found that Defendant acted promptly to evaluate her. (*Id.* at 15.) Specifically, during its

May 8, 2014 meeting, the CSE discussed the results of the private auditory-language processing

evaluation Plaintiff obtained in March and April 2014, and requested that the District perform its

own evaluation of M.S. (*Id.* at 14.) Ultimately, based on this new information, the June 2014

CSE added speech-language therapy and annual goals to M.S.'s IEP for the 2014-15 school year. (*Id.* at 15.)  Therefore, the SRO concluded that Defendant did not deny M.S. a FAPE based on this timing.  (*Id.*)

### b.  2014-15 School Year (Fifth Grade)

The SRO next turned to Plaintiff's claims relating to the 2014-15 school year.  First, the SRO addressed Plaintiff's claim that Defendant denied M.S. a FAPE for that year because the CSE "failed to develop a program that was research-based and provided the academic and language support [M.S.] required."  (*Id.* at 15.)  Based on a review of M.S.'s then-present levels of performance included in the IEP and the annual goals the CSE developed based on that performance, which was further based on test scores, the private and District speech-language evaluations, and information from M.S.'s teachers, the SRO found the June 2014 IEP was reasonably calculated to provide M.S. with meaningful educational benefit.  (*Id.* at 15–20.)  Acknowledging that additional reading services outside the IEP could not be considered, the SRO concluded that the June 2014 IEP nevertheless recommended a variety of supports to address M.S.'s reading needs.  (*Id.* at 19.)  In particular, the SRO noted that "there is no merit to the IHO's finding that the June 2014 IEP lacked provision for multisensory instruction; rather, the IEP referenced [M.S.'s] need for the same" and testimony indicated M.S. received multisensory instruction during the 2014-15 year.  (*Id.* at 19–20 & n.14.)  Finally, viewing the IEP prospectively, the SRO rejected Plaintiff's argument that M.S.'s failure to make progress under the 2014-15 IEP was evidence that it was not reasonably calculated to provide M.S. with educational benefit.  (*Id.* at 20.)

Next, the SRO addressed Plaintiff's claim that the IHO erred by not finding that the January 2015 CSE denied M.S. a FAPE by failing to recommend changes to her educational

programming despite a demonstrated decline in her performance in reading and math. (*Id.*) Based on a review of the "new information . . . available to the January 2015 CSE"—most importantly, the December 2014 triennial psychoeducational re-evaluation report—the SRO concluded that the new evidence did not render inappropriate the special education program and services set forth in the June 2014 IEP. (*Id.* at 20–23.) The SRO noted that at the January 23, 2015 re-evaluation review, the CSE incorporated information from the re-evaluation report and Plaintiff's "concerns about [M.S.'s] 'slow progress and weak academic skills'" in the IEP present levels of performance, and added counseling as a related service to the IEP. (*Id.* at 21–22.) The SRO further described M.S.'s test scores—specifically the WISC-IV, WIAT-II, and subtest standard scores in a series of reading and math areas—and noted that the psychologist who administered the re-evaluation testified that the gap between age and score "widens" for students who progress at a slower rate, like M.S. (*Id.* at 22.) Further, the SRO stated that, although Plaintiff's performance remained below grade level on the DIBELS and DAZE assessments, "she did exhibit progress in reading on those measures, as well as toward her IEP annual reading goals," and M.S. exhibited similar progress toward her mathematics annual goals by mid-year. (*Id.* at 22–23.) Therefore, the SRO concluded that, "[d]espite an overall decline in [M.S.'s] standardized test performance, review of the hearing record shows that the [D]istrict was responsive to [M.S.'s] lack of progress . . . by increasing the amount of academic supports and special education services the student received over time." (*Id.* at 23.) Moreover, the record showed that the June 2014 CSE was aware of these deficits when it developed the 2014-15 IEP, recommending annual goals in those areas as well as 12:1+1 special classes, and thus no new evidence before the January 2015 CSE indicated that the June 2014 IEP was no longer appropriate. (*Id.* at 23.)

The SRO then gave "separate in-depth treatment" to the Parties' disagreement over whether M.S. made progress during the 2014-15 school year, as it was also relevant to her review of the May 2015 IEP. (*Id.*) The IHO based his determination that M.S. had made little or no progress during the 2014-15 school year "primarily on the formal psychoeducational and neurophysical test results, as well as the private neuropsychologist's testimony." (*Id.* at 24 (quoting IHO Decision 21, 23).) However, the SRO concluded that the IHO "failed to consider other indications of student progress contained in the hearing record, including the June 2015 progress report for IEP annual goals, testimony from the student's teacher and related service providers, and progress monitoring tools, including a profile sheet that tracked [M.S.'s] progress in reading . . . which indicated that [M.S.] made progress in reading over the course of the school year." (*Id.*) Reviewing each of these items in turn, the SRO concluded that "the hearing record as a whole reveals that the student demonstrated meaningful progress" during the 2014-15 school year. (*Id.* at 25–27.) Specifically, the SRO noted "objective measurements" of M.S.'s progress "such as the DIBELS and DAZE" tests, as well as "annual goal progress reports and reports and testimony from . . . professionals who worked with [M.S.] on a day-to-day basis." (*Id.* at 27–28.) Ultimately, the SRO concluded that "[w]hile this may not have been the progress the parents desired for their daughter, [M.S.'s] progress—including the growing gap between [M.S.] and her nondisabled peers—must be measured in light of her abilities and the circumstances surrounding her educational experiences." (*Id.* at 28.)

### c.  2015-16 School Year (Sixth Grade)

The SRO then addressed the IHO's finding that Defendant denied M.S. a FAPE for the 2015-16 school year because the May 2015 IEP was "virtually identical" to the IEP for the previous school year, under which progress was "not realized." (*Id.* (quoting IHO Decision 23).)

Finding that M.S. *had* made progress under the prior year's IEP, as described above, and that the May 2015 IEP contained significant differences from the January 2015 IEP, the SRO concluded that Defendant had not denied M.S. a FAPE for the 2015-16 school year. (*Id.* at 28–31.)

The SRO began by reiterating that after reviewing evaluative information, including the March 2015 private neuropsychological evaluation, "[t]he May 2015 IEP provided a detailed and thorough description of [M.S.'s] present levels of performance and progress observed during the 2014-15 school year." (*Id.* at 28.)[12] Furthermore, comparing the January 2015 and May 2015 IEPs, and citing to testimony from M.S.'s special education teacher, reading specialist, speech-language pathologist, occupational therapist, and social worker, the SRO concluded that they "were not virtually identical" and indeed contained several differences. (*Id.* at 29–31.) Specifically, the May 2015 IEP included: (1) new annual goals and "modified continued, annual goals" to add "more stringent criteria for mastery, requiring increased performance from [M.S.]"; (2) a reduced student to teacher ratio from 12:1+1 to 5:1 for reading, "an area of primary deficit"; (3) an additional 42-minute 12:1 skills special class, three times per six-day cycle; (4) increased duration of all related service sessions by 12 minutes; (5) extended school year 5:1 small group occupational therapy to address typing skills; and (6) additional supplementary aids and services, program modifications, and/or accommodations, including positive reinforcement, cues and support to initiate tasks, copies of class notes, a multiplication table, re-teaching of material, and access to a computer. (*Id.* at 29–30.) The SRO also noted that the middle school psychologist testified as to how the May 2015 CSE's recommendations "aligned with or exceeded the

---

[12] The SRO also noted that the private neuropsychologist testified that he "never observed [M.S.] in the classroom," but also "responded affirmatively that it was important for an evaluator to know how a child performs in their day-to-day performance relative to how they performed on standardized assessment." (*Id.* at 28 n.17.)

recommendations made by the private neuropsychologist," including addressing M.S.'s need for "an intensive specialized program" through "special class placement in each content area." (*Id.* at 30–31.) Ultimately, the SRO found that May 2015 IEP "addressed [M.S.'s] academic, speech-language, social/emotional, motor, and management needs, and was reasonably calculated to provide [M.S.] with educational benefits." (*Id.* at 31.)

### d. Bullying

Finally, the SRO addressed Plaintiff's claim that Defendant failed to offer M.S. a FAPE in the 2013-14 and 2014-15 school years because it failed to include an anti-bullying plan in her IEPs to address incidents of bullying. (*Id.* at 31–35.) Plaintiff claims that M.S. suffered anxiety, lost control of her bladder, and cried almost daily as a result of this bullying. (*Id.* at 31.) After reviewing the entire hearing record, the SRO concluded that "the [D]istrict was not made aware of all of the incidents of alleged bullying . . . and that it responded appropriately to those of which it was made aware." (*Id.*) First, the SRO concluded that the alleged incidents during the 2013-14 school year "do not appear to be a result of bullying but rather the student's desire to socialize with peers at lunch and recess." (*Id.* at 32.) Moreover, "the [D]istrict met with [Plaintiff] in order to successfully resolve the issue." (*Id.* at 33.)

Plaintiff also described "three specific incidents" of bullying in the 2014-15 school year: (1) a peer called M.S. names on the school bus; (2) peers acted inappropriately towards her "in the community"; and (3) M.S. did not want to go to school in the morning and would cry once she returned home. (*Id.*) The SRO noted that Plaintiff testified that she did not report additional incidents to Defendant because M.S. asked her not to. (*Id.* at 33–34.) The SRO concluded that, even assuming these incidents constituted bullying, "the [D]istrict took steps in response to the incidents of which it had received notice." (*Id.* at 35.) Specifically, M.S.'s teachers addressed

the first two incidents "by approaching the students involved and ha[ving] the offending peers apologize to [M.S.]." (*Id.*) Furthermore, upon being notified of Plaintiff's concerns, the CSE responded: first, the January 2015 CSE added counseling to M.S.'s IEP, and later, when Plaintiff advised the May 2015 CSE that M.S. was being teased, the CSE continued the recommendation and added social and emotional goals to the IEP. (*Id.*) Indeed, the SRO reviewed M.S.'s IEPs and concluded that they "did describe [her] social/emotional needs and her relationships with her peers, as described by both the school personnel and the parents." (*Id.* at 34.) Additionally, the SRO found that, in light of the progress M.S. made during the 2014-15 school year, "these incidents of alleged bullying did not interfere with [her] ability to receive educational benefit from her program, substantially restrict [her] learning opportunities, or prevent her from making progress." (*Id.* at 35.) Accordingly, the SRO concluded that Defendant did not deny M.S .a FAPE for the 2014-15 school year based on the alleged instances of bullying. (*Id.*)

Thus, because the SRO found that Defendant offered M.S. a FAPE for the 2013-14, 2014-15, and 2015-16 school years, she did not reach the issue of unilateral placement and equitable considerations favoring tuition reimbursement. (*Id.*) The SRO sustained Defendant's appeal, dismissed Plaintiff's cross-appeal, and ordered the IHO's decision be modified accordingly. (*Id.* at 36.)

B.  Procedural History

Plaintiff commenced this Action by filing a Complaint on December 27, 2016. (Compl. (Dkt. No. 1).) On February 1, 2017, Defendant filed its answer. (Dkt. No. 5.) On February 10, 2017, Defendant filed a pre-motion letter requesting the Court schedule a conference to set a "summary judgment" motion schedule, pursuant to which Plaintiff would file a motion and Defendant would respond. (Letter from Mark. C. Rushfield, Esq. to Court (Feb. 10, 2017) (Dkt.

No. 8).) The Court held a conference on April 27, 2017 and set a briefing schedule on April 28, 2017. (*See* Dkt. (entry for Apr. 27, 2017); Mot. Scheduling Order (Dkt. No. 10).)

Plaintiff filed the instant Motion for Summary Judgment and accompanying papers on June 12, 2017. (Not. of Mot.; McGrath Decl.; Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. No. 13); Pl.'s 56.1.) Defendant filed an opposition and accompanying papers on July 12, 2017. (Def.'s 56.1; Def.'s Mem. of Law in Opp. to Mot. for Summ. J. ("Def.'s Mem.") (Dkt. No. 19).) Plaintiff filed a reply and a counter statement to Defendant's 56.1 statement on July 26, 2017. (Pl.'s Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Reply") (Dkt No. 20); Pl.'s Counter-56.1.)

## II. Discussion

### A. Statutory Background

The IDEA requires that states receiving federal funds provide a "free appropriate public education"—a "FAPE," for short—to "all children with disabilities." 20 U.S.C. § 1412(a)(1)(A); *see also Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017) (same). A FAPE "includes both 'special education' and 'related services,'" which a state must provide to a disabled child "'in conformity with the child's individualized education program,' or IEP." *Endrew F.*, 137 S. Ct. at 994 (quoting §§ 1401(9)) (alteration omitted). "School districts, through a CSE, are responsible for formulating a written IEP for every qualifying child." *L.O. v. New York City Dep't of Educ.*, 822 F.3d 95, 102 (2d Cir. 2016) (footnote omitted); *see also* 20 U.S.C. § 1414(d) (same).[13] "The IEP sets out the child's present educational performance,

_____

[13] "In New York, the state has assigned responsibility for developing IEPs to local CSEs. CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *L.O.*, 822 F.3d at 102 n.4 (alteration, citations, and internal quotation marks omitted); *see also* N.Y. Educ. Law § 4402(1)(b)(1)(a)).

establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *L.O.*, 822 F.3d at 102–03 (internal quotation marks omitted); *see also Endrew F.*, 137 S. Ct. at 994 (listing statutory criteria governing IEPs).

"The IDEA . . . requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1000; *see also Mr. P v. W. Hartford Bd. of Educ.*, --- F.3d ---, 2018 WL 1439719, at *16 (2d Cir. Mar. 23, 2018) ("Prior decisions of this Court are consistent with the Supreme Court's decision in *Endrew F.*"); *L.O.*, 822 F.3d at 103 ("To comply with the provisions of the IDEA, the IEP must be reasonably calculated to enable the child to receive educational benefits." (internal quotation marks omitted)). There is no "bright-line rule" determining "what 'appropriate' progress" means; rather, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S. Ct. at 1001; *see also S.C. v. Katonah-Lewisboro Cent. Sch. Dist.*, 175 F. Supp. 3d 237, 250 (S.D.N.Y. 2016) ("The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP." (internal quotation marks omitted)), *aff'd sub nom. J.C. v. Katonah-Lewisboro Sch. Dist.*, 690 F. App'x 53 (2d Cir. 2017). The Supreme Court recently explained that "[f]or children receiving instruction in the regular classroom, this would generally require an IEP reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Endrew F.*, 137 S. Ct. at 996 (internal quotation marks omitted). But, for "a child who is not fully integrated in the regular classroom and not able to achieve on grade level . . . his [or her] IEP . . . must be appropriately ambitious in light of his [or her] circumstances." *Id.* at 1000. In other words, an IEP "providing merely more than de minimis progress from year to year" is insufficient, *id.* at

1001 (italics and internal quotation marks omitted), but, it also need not "furnish[] . . . every special service necessary to maximize each handicapped child's potential," *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 199 (1982), or "provide[] everything that might be thought desirable by loving parents," *S.C.*, 175 F. Supp. 3d at 250.

In New York, if a parent believes that his or her child is being denied a FAPE, the parent may request an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by a local school board, *see* N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and the SRO's decision may be challenged in either state or federal court, *see* 20 U.S.C. § 1415(i)(2)(A). *See also L.O.*, 822 F.3d at 103 (describing the appeal process).

B.  Standard of Review

Unlike with an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in the IDEA context. *See, e.g., T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam).  Instead, summary judgment in IDEA cases is "in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted); *see also G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 570 (S.D.N.Y. 2010) (same), *aff'd*, 486 F. App'x 954 (2d Cir. 2012).  The Court's review therefore "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete de novo review." *L.O.*, 822 F.3d at 108 (internal quotation marks and italics omitted). Accordingly, the Court must "engage in an independent review of the administrative record and

make a determination based on a preponderance of the evidence." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012) (internal quotation marks omitted).

However, such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. "To the contrary, federal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.H.*, 685 F.3d at 240 (internal quotation marks omitted). However, to merit deference, the IHO's and SRO's decisions must be "thorough and careful." *S.C.*, 175 F. Supp.3d at 252 (internal quotation marks omitted). The quality of the decision can be judged on factors such as whether it is "well-reasoned" and "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir.2012) (internal quotation marks omitted); *L.O.*, 822 F.3d at 109 ("To merit deference, the SRO's or IHO's factual findings must be reasoned and supported by the record." (alteration and internal quotation marks omitted)). Additionally, the Second Circuit has instructed courts that deference to an SRO's decision is more appropriate when the substantive adequacy of an IEP, as opposed to the procedural adequacy, is at issue; when the decision involves a dispute over an appropriate educational methodology versus determinations regarding objective indications of progress; and when the district court's decision is based solely on the administrative record that was before the SRO. *See M.H.*, 685 F.3d at 244.

Where, as here, the IHO and SRO reach contrary conclusions, "reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO

as the final state administrative determination." *Id.* at 246; *see also A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (noting that "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight," because the court must "defer to the final decision of the state authorities" (internal quotation marks omitted)). However, if the Court concludes that

> the SRO's determinations are insufficiently reasoned to merit . . . deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis.

*M.H.*, 685 F.3d at 246. Therefore, this Court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189; *see also C.L. v. N.Y.C. Dep't of Educ.*, No. 12-CV-1676, 2013 WL 93361, at *5 (S.D.N.Y. Jan. 3, 2013) ("[T]he Second Circuit [has] explained that the deference owed to an SRO's decision depends on the quality of that opinion, or its persuasiveness." (citation and internal quotation marks omitted)), *aff'd*, 552 F. App'x. 81 (2d Cir. 2014).

C. Analysis

1. 2013-14 School Year (Fourth Grade)

Plaintiff argues that the District failed to provide M.S. with a FAPE during the 2013-14 school year because it failed to identify and address her language-based learning disability. (Pl.'s Mem. 11–13.) However, Plaintiff did not appeal the IHO's determination that the statute of limitations bars all claims arising before December 22, 2013. (SHO Decision 10.) Therefore, to the extent Plaintiff now raises claims relating to Defendant's failure to initially classify M.S. as having a language-based disability or to provide services to address such a disability in her

IEP for the 2012-13 school year or the 2013-14 school year, those claims are time-barred. (Pl.'s Mem. 12 (arguing that Defendant failed to identify and classify M.S.'s language-based learning disability based on a March 2012 initial evaluation (citing Pl.'s Ex. K)); *id.* (arguing that Defendant's initial speech evaluation from July 2012 failed to recommend speech services "although language needs were evident" (citing Pl.'s Ex. L)); *id.* (arguing that the March 14, 2013 IEP should have addressed M.S.'s speech and language needs in light of her performance in the classroom (citing Pl.'s Ex. D)); *see also* Pl.'s Ex. C (meeting to set M.S.'s third grade IEP in October 2012).) *See* N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 8, § 200.5(j)(5)(v) ("The decision of the impartial hearing officer shall be binding upon both parties unless appealed to the State review officer."). Plaintiff also argues that Defendant "failed to re-assess [M.S.'s] speech and language needs," as manifested in her "poor performance in the classroom." (Pl.'s Mem. 12–13.) In light of the statute of limitations and the undisputed fact that Defendant conducted a speech-language evaluation in May 2014, (Pl.'s Ex. O), the Court agrees with the SRO's determination that this amounts to a claim that Defendant failed to reevaluate M.S. in the time between December 22, 2013 and May 8, 2014, when the CSE requested a re-evaluation, (SRO Decision 12).

An updated speech-language evaluation is required only if (1) the school district determines that one is warranted, (2) the parents or teachers request one, or (3) the previous evaluation is three years or older. *See* 34 C.F.R. § 300.303; 8 N.Y.C.R.R. § 200.4(b)(4).[14] Taking these factors in reverse order, none of them applies here. Defendant conducted a speech and language evaluation of M.S. on July 10, 2012, well within three years of the applicable time

---

[14] The CSE also may not arrange for a re-evaluation more than once a year unless the parent and the school district representative on the CSE both agree otherwise. 34 C.F.R. § 300.303(b)(1); 8 N.Y.C.R.R. § 200.4(b)(4).

period, and the evaluator did not recommend speech/language therapy.  (Pl.'s Ex. L-1, L-7.)

Moreover, Plaintiff cites no evidence showing that Plaintiff or M.S.'s teachers requested a

speech-language evaluation prior to May 8, 2014, when Plaintiff provided the results of the

private auditory-language processing evaluation to the CSE at its annual review meeting.  (Def.'s

56.1 ¶ 4.)  And, in response to this disclosure, the CSE "agreed to request a speech/language

evaluation," (Pl.'s Ex. F-1), which Defendant conducted on May 20 and 23, 2014, (Pl.'s Ex. O-

1).

Finally, the Court agrees with the SRO's well-reasoned determination that M.S. did not

exhibit speech-language needs necessitating that Defendant conduct a re-evaluation between

December 22, 2013 and May 8, 2014.  (SRO Decision 12–15.)  In reaching this conclusion, the

SRO evaluated all of the information about M.S.'s speech-language skills available to the CSE

during that time period—namely, the District's July 2012 speech-language evaluation and the

present levels of performance in the March 2013 IEP—and found no evidence of speech-

language needs necessitating a re-evaluation.  (*Id.* at 12–13.)  M.S.'s scores on the tests

administered in July 2012 yielded scores of "high average" for receptive vocabulary and

"average" for expressive vocabulary.  (Pl.'s Ex. L-1–L-2.)  She also received "average range"

scores for all categories of the Clinical Evaluation of Language Fundamentals 4 ("CELF 4") test,

including an "average" Core Language score of 109—"the most representative measure of [her]

language skills"—and an "average" Receptive Language score of 96—"the lowest of the

indexes, and a relative weakness for [M.S.]."  (*Id.* at L-5, L-7.)  Based on these average scores

and M.S.'s placement in the ICT class for third grade, the District evaluator did not recommend

speech-language therapy for M.S.  (*Id.* at L-7.)  Although the report did note that the statistical

discrepancy between M.S.'s receptive language index and expressive language index scores

"may have an impact on intervention and the classroom," including "difficulty understanding directions given by the teacher, identifying relationships between words and phrases, or understanding simple and complex sentences," (*id.* at L-4), the SRO credited the testimony of Rachel Thomas, a District speech pathologist, that these test results did not suggest M.S. would have trouble following directions, as M.S. received a "solidly average" range score on the "concepts and following directions" subtest, and thus "at that point it wasn't indicated [M.S.] had any difficulty following directions in class," (SRO Decision 13 (citing Tr. 493–94 (interpreting Pl.'s Ex. L-4); *id.* at 481–82 (same); *id.* at 381 (testifying to Thomas' credentials))).

This conclusion is supported by the March 2013 IEP, which does not indicate that Plaintiff or school staff raised any concerns relating to M.S.'s speech-language abilities. (Pl.'s Ex. D.) Plaintiff argues that at the time of the CSE's meeting, M.S. "was well below benchmark in reading fluency," "had a significant delay in reading comprehension," and "required extended time to process thoughts." (Pl.'s Mem. 12 (citing Pl.'s Ex. D-3).) However, the SRO acknowledged these points in the IEP's present levels of performance, and noted that the IEP attempted to address at least the issue of additional processing time by providing it as a supplementary aid in the classroom. (SRO Decision 13 (citing Pl.'s Ex. D-7).) The IEP also added two annual reading goals—both of which were to be assessed every two weeks— addressing reading fluency and comprehension. (Pl.'s Ex. D-5–D-7.) Plaintiff does not explain why the cited information in the IEP regarding Plaintiff's reading and processing abilities required Defendant to conduct an additional speech-language evaluation, particularly when these issues comport with, and are indeed based partially on, the less than one-year-old July 2012 evaluation that yielded a recommendation of no speech-language therapy. (Pl.'s Ex. D-1–D-2 (listing 2012 evaluation and CELF-4 results).) *See D.M. v. City Sch. Dist. of the City of New*

*York*, No. 15-CV-1619, 2016 WL 319859, at *6 (S.D.N.Y. Jan. 26, 2016) (holding that "[t]he CSE was not required to obtain or await an updated [evaluation] to comply with the IDEA" when it "relied on oral input from [the student]'s parents . . . and teachers," "written classroom-based assessments and reports," and an evaluation that "was not yet three years old" at the time of the meeting and "neither [the student's] parents nor teachers had requested an updated [evaluation] for the CSE meeting"); *T.F. v. The New York City Dep't of Educ.*, No. 14-CV-3401, 2015 WL 5610769, at *4 (S.D.N.Y. Sept. 23, 2015) ("[T]he CSE is not required to conduct updated evaluations where it has sufficient evaluative materials reflecting the student's present level of performance."); *C.U. v. New York City Dep't of Educ.*, 23 F. Supp. 3d 210, 230 (S.D.N.Y. 2014) (noting that the CSE did not need to conduct a re-evaluation when it had a less than two-year old evaluation and a recent report reflecting an assessment of the student's needs).

Plaintiff cites no additional evidence in the record that should have prompted Defendant to conduct a re-evaluation, except the March 2014 private auditory-language processing evaluation. (Pl.'s Mem. 13 (citing Pl.'s Ex. N).) Because it is undisputed that Plaintiff did not provide Defendant with this evaluation until May 8, 2014 at the annual meeting, (Def.'s 56.1 ¶ 4), after which the CSE requested that Defendant perform its own speech/language evaluation and decided to "reconvene in June 2014 to review all of the[] findings and discuss recommendations," (Pl.'s Ex. F-1), and that said evaluation was performed on May 20 and 23, 2014 (Pl.'s Ex. O), the mere existence of the March 2014 report does not alter the above analysis regarding whether the CSE should have requested a speech-language evaluation *before* May 8, 2014. In any event, the SRO in fact reviewed the March 2014 evaluation and May 2014 speech-language evaluation before concluding that M.S. did not "fail[] to progress toward her IEP

annual goals or otherwise exhibit[] difficulties in the classroom environment so as to require the [D]istrict to initiate an evaluation of her speech-language skills." (SRO Decision at 13–15.)

Indeed, the SRO described the findings of the March 2014 evaluation in detail. She noted that M.S. performed "within normal limits" in all but two areas of listening-language— auditory memory and reasoning—which affected her listening skills. (SRO Decision 13 (citing Pl.'s Ex. N-6–N-7).) And, the SRO stated that the evaluation "reported that at that time [M.S.] did not listen carefully to directions, was distracted by background noise, could not attend to auditory stimuli, exhibited auditory memory and sound discrimination difficulties, and displayed delayed responses to verbal stimuli." (*Id.* (citing Pl.'s Ex. N-1).) However, the SRO actually gave this statement more credit than it was due—this list of problems is actually a list provided *to* the evaluator by Plaintiff in filing out a checklist for referral, rather than observations actually made by the evaluator. (Pl.'s Ex. N-1 ("Reason for Referral").) Plaintiff cites no evidence indicating she made such complaints to Defendant before seeking this private evaluation, or that any of M.S.'s teachers or support staff in the District had made similar observations. In any event, while the evaluation indicated that M.S. was at risk for having trouble learning in the classroom environment, it does not establish that M.S.'s classroom performance between December 22, 2013 and May 8, 2014 exhibited such difficulties requiring a re-evaluation. Rather, the report speaks in general, prospective terms and makes no observations regarding M.S.'s previous classroom work. (*See, e.g.*, Pl.'s Ex. N-7 ("We see that students struggling in more than one listening area in the one to one test situation . . . will struggle in the classroom."); *id.* ("It is believed that these listening language areas also impact reading ability and her social language ability.").) Indeed, the evaluator stated that M.S.'s new listening language test results constitute a drop from M.S.'s "average range" 2012 test results, explaining that M.S. "is *now*

seen as struggling with listening skills that impact language abilities."  (Pl.'s Ex. N-7 (emphasis added).)  Further, as the SRO noted, the evaluator found that M.S.'s "strong language abilities mask her language struggles," including information processing.  (SRO Decision 13 (quoting Pl.'s Ex. N-7).)

In any event, as the SRO found, Defendant still "acted promptly to evaluate [M.S.]" once Plaintiff provided the 2014 evaluation which recommended speech and language therapy.  (SRO Decision 15.)[15]  As explained above, the May 2014 CSE agreed to request a speech-language evaluation, (Pl.'s Ex. F-1), and, after two days of assessment, the District's speech-language pathologist also recommended M.S. receive therapy, (Pl.'s Ex. O-1, O-5), in a report that the SRO also describes in detail, (SRO Decision 14).  Accordingly, the June 2014 CSE added speech-language therapy and speech-language annual goals to M.S.'s IEP for the next school year.  (Pl.'s Ex. E-1.)[16]  Plaintiff argues that Defendant would not have re-evaluated M.S. if she had not obtained the private evaluation, which impermissibly shifted Defendant's burden to identify M.S.'s language issues to Plaintiff.  (Pl.'s Mem. 13.)  The Court will not speculate as to what Defendant would or would not have done absent the private evaluation.  Rather, the Court defers to the SRO's thorough analysis, amply supported by the record, and her conclusion that Defendant did not deny M.S. a FAPE by failing to conduct a speech-language evaluation of M.S. prior to May 2014.  *See T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 169 (2d

---

[15] Plaintiff disputes this finding, arguing that Defendant "did not provide services for almost six months after [Plaintiff] obtained the private evaluation that strongly recommended services."  (Pl.'s Mem. 13 n.14 (citing Pl.'s Ex. E-1).)  But, as discussed above, Plaintiff did not provide this report to Defendant until May 2014, making this delay far less than six months.  In any event, this argument is irrelevant to Plaintiff's claim that Defendant should have *re-evaluated* M.S. earlier.

[16] Plaintiff does not contest the SRO's conclusion that "this recommendation for the subsequent school year does not cast aspersion retroactively on the [D]istrict's actions in the prior school year."  (SRO Decision 15.)

Cir. 2014) (holding that the SRO's decision that the school did not deny the student a FAPE for failing to conduct an evaluation turned on "fact-specific educational questions [that] are precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers" (internal quotation marks omitted)); *see also C.U.*, 23 F. Supp. 3d at 230 (deferring to "the IHO's careful decision" that failure to conduct a re-evaluation did not deny a student a FAPE).

### 2. 2014-15 School Year (Fifth Grade)

Plaintiff contends that Defendant failed to provide M.S. with a FAPE during the 2014-15 school year because neither the June 2014 IEP nor the January 2015 IEP was reasonably calculated to enable her to make progress appropriate in light of her circumstances. (Pl.'s Mem. 13–16.) *See Endrew F.*, 137 S. Ct. at 1000 (setting IDEA standard). The Court will address each of these claims separately.

### a. June 2014 IEP

Plaintiff argues that the June 2014 IEP was inadequate "because it failed to recommend a program that was based on peer-reviewed research or provide the academic or language support M.S. needed." (Pl.'s Mem. 14.) Specifically, Plaintiff argues that M.S. "required research-based multisensory methods" to address her language-based disability and "more intensive reading and math interventions" so that she could progress. (*Id.* at 14–15.) In reviewing the substantive adequacy of the June 2014 IEP, the SRO viewed the CSE's recommendations in light of the evaluative information it had regarding M.S.'s then-present levels of performance. (SRO Decision 15–20.) Based on this analysis, the SRO determined that the June 2014 CSE's recommendations were appropriate to meet M.S.'s needs. (*Id.* at 20.) The record supports this conclusion.

The June 2014 CSE considered the results of both private and District evaluations of M.S., test results, and information from M.S.'s teachers and service providers. (Pl.'s Ex. E-1–E-8; Tr. 424–25, 1843.) As a result, the CSE recommended M.S.'s placement in the special 12:1+1 class for all academic areas based on her "weak academic skills," (Pl.'s Ex. E-1, E-10–E-11), a program of related services because M.S. was a "high needs student who [had] difficulty maintaining her focus and attention," (*id.* at E-1), and ten supplementary aids and service accommodations, along with assistive technology recommendations, (*id.* at E-11–E-12). The Court agrees with the SRO that each of these recommendations was reasonably calculated to enable M.S. to make educational progress.

Plaintiff argues that the IEP failed to add more intensive interventions despite M.S.'s poor performance in reading and math. (Pl.'s Mem. 14–15.)[17] However, the Court agrees with the SRO that the IEP was reasonably calculated to address the difficulties M.S. exhibited during the year. While the IEP noted M.S.'s "tremendous growth in her reading abilities," including increased confidence, satisfactory listening skills during English and Language Arts ("ELA") instruction, and an increase in DIBELS progress monitoring scores, it also acknowledged that M.S. "still falls well below the benchmark for fourth grade." (Pl.'s Ex. E-5.) Thus, the IEP stated that "[c]ontinued as well as consistent monitored practice in fluency and reading comprehension is necessary." (*Id.*) In math, the IEP stated that M.S.'s performance on the fourth grade fall placement inventory and math assessment reflected low scores of 8/30 in

---

[17] Plaintiff does not argue that M.S. required more intensive interventions in any other academic areas, so the Court declines to discuss them here. However, the Court notes that the SRO gave these areas in-depth treatment, describing M.S.'s present levels of performance in writing, social development, speech and language, and physical development, before concluding that the IEP was reasonably calculated to permit M.S. to progress in these areas. (SRO Decision 15–17.)

computation and 0/5 in problem solving. (*Id.* at E-6.) It also noted that M.S. "ha[d] difficulty taking notes and requires assistance to stay on task," that she is more willing to accept assistance and contribute in groups than individually, and that she regularly completes her homework. (*Id.*) M.S.'s father also informed the CSE that he "has observed her difficulties with math," but Plaintiff opted M.S. out of the state-wide math assessment test. (*Id.*)

The IEP addressed these issues in reading and math—along with the other areas discussed in the SRO's decision—in a number of ways. First, the CSE determined that M.S.'s "needs" included "additional support of special education services to be successful in the regular education classroom," "to improve her reading fluency and comprehension skills," "support with writing assignments," and to "review[] and practice[]" math concepts "after a lesson is taught." (Pl.'s Ex. E-6, E-8.) Moreover, the IEP added measurable annual goals in study skills, reading, and math, each of which specified its criteria for achievement, and how and when progress would be measured. (*Id.* at E-9.) As the SRO noted, Plaintiff would receive written reports of M.S.'s progress toward meeting these goals three times a year. (SRO Decision 18 (citing Pl.'s Ex. E-10).) The IEP recommended a 12:1+1 special class placement for *all* of Plaintiff's subjects, rather than only reading, math, and skills. (*Compare* Pl.'s Ex. E-10–E-11 *with* Pl.'s Ex. D-7.) The CSE did this because, according to its meeting minutes, M.S. had "weak academic skills" and was "a high needs student who has difficulty maintaining her focus and attention." (Pl.'s Ex. E-1.) The IEP also recommended several supplementary aids and services, program modifications, and/or accommodations for daily use during instructional time in the classroom which appear targeted at Plaintiff's academic progress, including, for example, refocusing and redirection, checking for understanding, breaking assignments into smaller components, providing copies of class notes, and highlighting key details within text. (*Id.* at E-11–E-12.) The

SRO detailed all of these recommendations and how they were designed to address M.S.'s needs. (SRO Decision 15–20). Plaintiff does not address any of these arguments, instead asserting only that M.S.'s reading and math scores were still low. (Pl.'s Mem. 15.) Indeed, Plaintiff does not even explain what "more intensive reading and math interventions" were necessary, nor does Plaintiff cite a case requiring the CSE to include them in the IEP merely because of low test scores. (*Id.*)[18] Therefore, the Court defers to the SRO's well-reasoned decision as to the substantive adequacy of the June 2014 IEP regarding M.S.'s reading and math skills.

Plaintiff also argues that the "IEP noted M.S.'s need for multisensory instruction, but [Defendant] failed to recommend a research-based multisensory method or program in her IEP." (Pl.'s Mem. 14.)[19] New York regulations require that an IEP "shall, to the extent practicable, be based on peer-reviewed research." 8 N.Y.C.R.R. § 200.4(d)(2)(b). But, the IEP need not identify a specific "educational methodology" to satisfy the IDEA. *K.L. ex rel. M.L. v. New York City Dep't of Educ.*, No. 11-CV-3733, 2012 WL 4017822, at *12 (S.D.N.Y. Aug. 23, 2012), *aff'd*, 530 F. App'x 81 (2d Cir. 2013) (rejecting argument that an IEP was "substantively deficient because it did not mention evaluative methods or a particular teaching methodology . . . for substantially the same reasons stated in the District Court's well-reasoned opinion"). Nor does the failure to specify the peer-reviewed academic literature that would support the methodology referenced in an IEP render it incapable of providing a FAPE. *See, e.g., Jenn-*

---

[18] Plaintiff argues that the building level reading services that M.S. received three times per week were outside of her IEP and thus could not be considered in determining whether the IEP was reasonably calculated to promote progress in reading. (Pl.'s Mem. 14.) The IHO and SRO both agreed with this point, but concluded that the June 2014 IEP was substantively adequate without relying on the additional reading services M.S. received. (IHO Decision 17; SRO Decision 19–20.)

[19] Defendant argues that Plaintiff did not administratively exhaust this claim. (Def.'s Mem. 14 n.6.) But, Plaintiff's due process hearing notice alleged a deprivation of a FAPE based on Defendant's failure to recommend research-based methodologies. (Pl.'s Ex. A-8.)

*Ching Luo v. Baldwin Union Free Sch. Dist.*, No. 10-CV-1985, 2012 WL 728173, at *5

(E.D.N.Y. Mar. 5, 2012) ("IDEA does not provide a right to an evaluation that is supported by

citations to peer-reviewed academic literature, as [the] [p]laintiff's [c]omplaint suggested."),

*aff'd*, 556 F. App'x 1 (2d Cir. 2013). However, "when the reports and evaluative materials

present at the CSE meeting yield a clear consensus, an IEP formulated for the child that fails to

provide services consistent with that consensus is not reasonably calculated to enable the child to

receive educational benefits, and the state's determination to the contrary is thus entitled to no

deference because it is unsupported by a preponderance of the evidence." *A.M. v. New York City

Dep't of Educ.*, 845 F.3d 523, 543 (2d Cir. 2017) (citation and internal quotation marks omitted).

Plaintiff has cited no evidence demonstrating such a "clear consensus" that M.S. was

entitled to a specific service or teaching method that her IEP did not provide. *Id.* The IEP states

that M.S. "needs . . . a multi-sensory approach to learning" in order to support her learning.

(Pl.'s Ex. E-6.) However, as the SRO noted, Basile, a District reading specialist, defined

multisensory instruction as a general approach rather than a specific program—specifically, it

refers to methods that utilize a student's "listening, speaking, seeing and hearing." (SRO

Decision 20 (citing Tr. 788).) The SRO further noted that Basile testified that M.S. received

multisensory instruction in reading, (*id.* at 20 n.14 (citing Tr. 787–89); *see also* Tr. 830–35), and

that Plaintiff did "not detail what multisensory instruction [she] feel[s] should have been

included in the June 2014 IEP," (*id.* at 20). The SRO's conclusion, based on an evaluation of

whether the educational methods chosen were proper and the testimony of the District's trained

educators, is owed deference.[20] *See M.H.*, 685 F.3d at 244 (noting that deference to an SRO's

---

[20] The SRO disagreed with the IHO, who found that the IEP failed to make a provision
for multisensory speech-language instruction. (IHO Decision 23.) But, the Court must defer to

decision is appropriate when the decision "involve[es] a dispute over an appropriate educational methodology"). This deference is particularly appropriate where the SRO also reviewed the IEP's recommendations and concluded that they were reasonably calculated to address M.S.'s speech-language needs. (SRP Decision 15–20.) The SRO found that the addition of speech-language services, supplementary aids and technology, and annual goals was tailored to meet M.S.'s specific needs. (*Id.* at 16–20.) The SRO cited the testimony of the district speech-language pathologist, who conducted the May 2014 evaluation and who stated that the recommended program—30 minutes of 5:1 speech-language therapy twice a week and 30 minutes of 2:1 speech-language therapy once a week, (Pl.'s Ex. E-1)—was designed to allow M.S. to focus on speech-language issues during the 5:1 sessions and auditory training during the 2:1 Session, (SRO Decision 18 (citing Tr. 425–426)). Indeed, the SRO concluded that the IEP was "consistent with the recommendations from the private auditory-language evaluation report and the [D]istrict May 2014 speech-language evaluation report." (*Id.* at 19.) The record supports this conclusion. (*Compare* Pl.'s Ex. N-15 (recommending use of an FM system), *with* Pl's Ex. E-12 (same); *compare* Pl.'s Ex. N-8 (recommending M.S. work on processing speech), *with* Pl.'s Ex. E-10 (setting this as an annual goal); *compare* Pl.'s Ex. O-5 (recommending therapy focus on defining words and listening comprehension), *with* Pl.'s Ex. E-10 (setting specific goals for vocabulary and listening comprehension).) Therefore, based on the evaluative data before the June 2014 CSE and according due deference to the SRO's well-reasoned conclusions, the Court finds that the June 2014 IEP did not deny M.S. a FAPE.

---

the SRO's well-reasoned decision as the "final decision of the state authorities." *A.C.*, 553 F.3d at 171.

### b.  January 2015 IEP

Plaintiff argues that Defendant denied M.S. a FAPE because it did not make changes to her IEP after its triennial evaluation of M.S. "showed an overwhelming decline in [her] academic performance."  (Pl.'s Mem. 15.)  The Court agrees with the SRO's decision, based on her review of the information before the January 2015 CSE, that the IEP did not deny M.S. a FAPE.  (SRO Decision 20–23.)

In late 2014, the District conducted a state-mandated psycho-educational re-evaluation of M.S., prepared by school psychologist Dr. Helen M. Klein.  (Pl.'s Ex. JJ.)  The report includes an extensive discussion of M.S.'s educational and medical history, as well as her recent standardized testing data.  (*Id.* at JJ-1–JJ-5.)  As part of this discussion, Dr. Klein noted M.S. "has made a nice adjustment" to fifth grade, including "respond[ing] well to clear expectations for performance" and that she "is receiving a high level of support services."  (*Id.* at JJ-4.)  Dr. Klein administered four tests to M.S. and made a series of behavioral observations.  (*Id.* at JJ-5.)  Before introducing her findings, she noted that, based on variability and her social history, M.S.'s "cognitive capabilities may be higher than scores reflect."  (*Id.*)

M.S.'s scores in overall intellectual functioning, perceptual reasoning, and processing speed were comparable to past scores.  (*Id.* at JJ-6–JJ-7.)  However, she scored significantly lower in verbal comprehension and working memory.  (*Id.* at JJ-7.)  M.S. also received a "below average" reading composite score, which "reflects limited basic skills," (*id.* at JJ-8), and a "below average" mathematics composite score, based in part on "a poor sense of numbers, limited grasp of basic processes and much difficulty with arithmetic reasoning," as well as "basic, early elementary level" calculation and computation skills, (*id.* at JJ-9–JJ-10). Ultimately, Dr. Klein summarized M.S.'s "[r]elative weakness" in some cognitive capabilities,

and "well below grade level" academic skills, including "weak" reading skills and "quite limited" math skills. (*Id.* at JJ-13.) She therefore recommended that M.S. continue special education services, occupational and speech/language therapy services, and social skills group, as well as her test accommodations and program modifications. (*Id.*) Dr. Klein also suggested that the parents continue outside consultations and activities, as well as at-home monitoring. (*Id.*)

On January 23, 2015, the CSE convened to review the results of the re-evaluation. (Pl.'s Ex. G-1.) No changes were made to M.S.'s instructional program, but 5:1 small group counseling was added to her IEP as a "related service." (*Id.* at G-1, G-9.) The CSE meeting minutes also indicated that M.S. works with a reading specialist and that her social skills group, occupational therapy, and speech/language therapy should continue. (*Id.* at G-1.)

The SRO found the CSE's actions did not deny M.S. a FAPE for two main reasons. First, while acknowledging deficiencies reflected in M.S.'s test scores, the SRO found that M.S. did in fact make progress toward her annual reading and math goals during the 2014-15 school year. (SRO Decision 22–23.) The record supports this conclusion. M.S.'s 5th Grade Progress Profile shows that, although her scores were still below benchmark, she had made progress toward her reading goals set forth in the June 2014 IEP. (*Compare* Pl.'s Ex. E-9 (M.S.'s first reading goal) *with* Pl.'s Ex. HH-1 (showing M.S. increased her word count per minute (WCPM) and accuracy throughout the year and decreased reading errors).)[21] It also shows that her reading comprehension increased over the year. (Pl.'s Ex. HH-1.) Similarly, the 2014-15 IEP annual goal progress report shows that M.S. was making progress towards her math annual goals

_____

[21] On the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), M.S.'s word count per minute increased from 65 to 103, her errors decreased from 4 to 2, and her accuracy increased from 94% to 98%. (Pl.'s Ex. HH-1.)

by mid-year. (Def.'s Ex. 3 at 4.) Furthermore, the SRO credited Dr. Klein's testimony regarding her evaluation of M.S., attributing M.S.'s decline in certain areas to the widening gap between students who progress at an average rate and those who progress at a slower rate, which increases with age. (SRO Decision 22 (citing Tr. 1851–52 (testifying that for students who progress at a rate slower than their peers, percentiles can "go way down" because higher level comprehension increases with age)).)

Second, the SRO found that the CSE's decision to maintain M.S.'s current instructional program was based in part on the fact that it "was aware of [M.S.'s] reading and math deficits" in June 2014, which is why it recommended annual goals in those areas, as well as 12:1+1 Special class instruction in all classes. (SRO Decision 23.) The record supports this conclusion. The June 2014 IEP indicates that the CSE was aware that M.S. was "well below" the grade level benchmark in reading and performed poorly in mathematics, particularly in computation and problem solving. (Pl.'s Ex. E-6.) Indeed, the CSE made its recommendations because it found M.S. had "weak academic skills" and was a "high needs" student. (Pl.'s Ex. E-1.)

Although the CSE was obligated to "consider . . . [the] results of the initial or most recent evaluation of [M.S.]," 34 C.F.R. § 300.324(a)(1)(iii), it did just that. Plaintiff cites no law requiring the CSE to *change* M.S.'s IEP based on the results of that evaluation, at least under these circumstances. Rather, the IEP need only be "appropriately ambitious in light of [M.S.'s] circumstances" in order to provide her with a FAPE. *Endrew F.*, 137 S. Ct. at 1000. The Court agrees with the SRO that the evidence before the January 2015 CSE "was not such that it revealed the special education program and services set forth in the June 2014 IEP to be no longer appropriate for [M.S.]" (SRO Decision 23.) Therefore, the January 2015 IEP did not deny M.S. a FAPE.

### 3.  2015-16 School Year (Fifth Grade)

Plaintiff claims that Defendant denied M.S. a FAPE for the 2015-16 school year because it did not modify her programming from the 2014-15 school year, during which she made no progress.  (Pl.'s Mem. 16–21.)  This claim raises two distinct, but related issues: (1) whether M.S. failed to make progress during the 2014-15 school year, and (2) whether the May 2015 IEP was reasonably calculated to enable M.S. to make progress appropriate in light of her circumstances.

### a.  Progress during the 2014-15 School Year

"A school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement."  *T.P.*, 554 F.3d at 254 (alteration and internal quotation marks omitted).  When "an IEP is modeled on a prior one," a student's progress under that prior IEP, although "not dispositive," is relevant to deciding whether the new IEP is "reasonably calculated to continue that trend."  *S.H. ex rel. W.H. v. Eastchester Union Free Sch. Dist.*, No. 10-CV-3927, 2011 WL 6108523, at *10 (S.D.N.Y. Dec. 8, 2011); *see also H.C. ex rel. M.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, 528 F. App'x 64, 67 (2d Cir. 2013) (upholding district court's conclusion that because the student made progress in previous years, the later, similar IEPs were reasonably calculated to enable progress).  There is no "bright-line rule" determining what constitutes "'appropriate' progress," but it cannot furnish "merely more than de minimis progress" and it must be tailored to "the unique circumstances of the child."  *Endrew F.*, 137 S. Ct. at 1001; *see also H.C.*, 528 F. App'x at 67 (noting that "a child's academic progress must be viewed in light of the limitations imposed by the child's disability").

The IHO agreed with Plaintiff that M.S. failed to make progress during the 2014-15 school year—in other words, while the IEP for the 2014-15 school year was reasonably calculated to provide M.S. with meaningful educational benefit, "such calculation was not realized." (IHO Decision 23.) The SRO disagreed, finding that the IHO based his determination primarily on formal test results and testimony of the evaluator to the exclusion of other objective measurements that indicated M.S. made progress. (SRO Decision 24, 27–28.) Specifically, the IHO failed to consider the June 2015 progress report, testimony from M.S.'s teacher and related service providers, and a progress monitoring profile sheet that tracked M.S.'s reading progress throughout the 2014-15 school year. (*Id.* at 24.) The SRO found that this objective evidence demonstrated meaningful progress during the 2014-15 school year, despite M.S.'s standardized test scores. (*Id.* at 27–28.) Because the IHO and the SRO disagreed, the Court "must defer to the reasoned conclusions of the SRO as the final state administrative determination," unless the SRO's decision was "insufficiently reasoned" and the IHO's decision was "more thorough and carefully considered." *M.H.*, 685 F.3d at 246.

The Court finds that the SRO's decision was sufficiently, indeed persuasively, reasoned. The SRO first looked to the testimony of M.S.'s fifth grade special education teacher, Christa Sassano, who indicated that M.S. made progress in the 12:1+1 class. (SRO Decision 25 (citing Tr. 217–19).) Sassano testified that the small and structured classroom environment was central to M.S.'s progress, because it allowed her and M.S.'s other instructors to provide the support M.S. needed across all academic areas. (Tr. 217–19.) For example, she could seat M.S. closer to instruction, check in with her frequently, and pull M.S. aside to review directions or concepts she did not understand. (*Id.* at 219.) Sassano also noted that the small class setting, as well as ample "reenforcement, frequent reteaching, [and] clarification," made M.S. more comfortable in raising

her hand and speaking out when she was confused or needed extra help. (*Id.* at 218–19.) With these supports in place, Sassano testified, M.S. was "able to gradually progress." (*Id.* at 219.)

Sassano also testified that M.S. "for the most part reached all of her goals" during the 2014-15 year. (*Id.* at 255.) The SRO concluded that this testimony comported with the June 2015 IEP annual goal progress report, which reflected that M.S. achieved 11 of 17 annual goals. (SRO Decision 25 (citing Def.'s Ex. 3 at 1–7.) Plaintiff argues that the SRO erred in relying on this progress report, because the teacher modified some of the enumerated goals to state that M.S. could perform them "with moderate teacher assistance," implying that M.S. could not do so independently as required. (Pl.'s Mem. 17–18 (citing Def.'s Ex. 3 at 3); *see also* Pl.'s Reply 3.) The Court disagrees.

The June 2014 IEP set forth seventeen annual goals, divided into six categories: (1) study skills, (2) reading, (3) writing, (4) mathematics, (5) speech/language, and (6) motor skills. (Pl.'s Ex. E-9–E-10.) Each goal indicated a corresponding criteria, method, and schedule, which were used to measure M.S.'s progress toward achievement. (*Id.* at E-9.) For example, to achieve her first reading goal—reading words per minute fluently with accuracy and appropriate rate—M.S. would need to demonstrate 70% accuracy over 1 week (criteria) via teacher devised tests or worksheets (method) conducted every week (schedule). (*Id.*) The June 2015 progress report includes a legend to describe M.S.'s progress toward achieving these goals during the 2014-15 school year: "A" denotes "Achieved," "PG" denotes "Progressing Gradually," "NA" denotes "Not Achieved," "PS" denotes "Progressing Satisfactorily," "PI" denotes "Progressing Inconsistently," and "SC" denotes "See Comments." (Def.'s Ex. 3 at 1.) According to the progress report, M.S. achieved eleven of her seventeen goals. (*Id.* at 2–7.) For the remaining

goals, the report indicated "SC," and included comments specific to M.S.'s performance in that area.  (*Id.* at 3–6.)  In sum, the report showed the following progress:

Study skills:  M.S. achieved her study skills goal—to "learn how to take notes and submit her notes for review and approval by her teacher for teacher selected assignments or classes." (*Id.* at 2.)  This required 70% success over one week via writing samples.  (*Id.*)

Reading:  M.S. achieved her first reading goal—"read[ing] words per minute fluently with accuracy and at an appropriate rate"—which required 70% accuracy over of one week via weekly tests and worksheets.  (*Id.* at 3.)[22]  M.S. also achieved her second reading goal— identifying the main theme, explaining key supporting details, and summarizing the text—which required 70% accuracy over two weeks via work samples produced every marking period.  (*Id.*) However, the report indicates that M.S. achieved 70% accuracy on this goal "with moderate teacher assistance," and that "[t]his skill should continue to be addressed next year."  (*Id.*)  Given that the IEP did not include this caveat in its criteria for measuring achievement, the Court agrees with Parent that this goal was not properly characterized as "achieved."  (Pl.'s Mem. 17.)

Writing:  M.S. achieved one of her three writing goals—to write an opinion piece that was supported by reasons, used linking words, and included a closing statement—which required 75% accuracy over one week via weekly writing samples.  (Def.'s Ex. 3 at 4.)  She performed

---

[22] For the first time in her reply brief, Plaintiff argues that this goal should be discounted because it "lacked measurable terms."  (Pl.'s Reply 3.)  Even if the Court were to consider this new argument, it fails.  *See Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) ("[N]ew arguments may not be made in a reply brief. . . .").  First, Plaintiff did not object to the inclusion of this goal in the IEP.  (Pl.'s Ex. E-1 (meeting notes indicating that "[t]he parents were in agreement with the [CSE's] recommendations").)  More importantly, the "method" by which "progress will be measured" defines the measurable terms—namely, the teacher devises tests or worksheets, presumably by which the number of words will be set.  (*Id.* at E-9.)  In any event, even if the goal is vague, an evaluator found that M.S. met it, and the SRO was entitled to rely on that fact.

the remaining writing skills with the desired accuracy—specifically, 80% accuracy for punctuation and capitalization and 70% accuracy for spelling. (*Id.*) But, she only achieved these goals with "moderate teacher's assistance," meriting an "SC" notation rather than "A." (*Id.*) Specifically, for capitalization and punctuation, M.S. "needs reminders to go into her writing and check for" these issues, and for spelling, M.S. "needs assistance with her spelling when writing." (*Id.*) The report also notes that these "skill[s] should continue to be addressed next year." (*Id.*)

Mathematics: In mathematics, M.S. achieved two of her three goals. (*Id.* at 5.) She achieved her goal to use place value and properties of operations to add and subtract within 1000, which required 75% accuracy over two weeks via monthly tests or worksheets. (*Id.*) M.S. also achieved her fractions identification goal, which required 75% accuracy over two weeks via assessments every marking period. (*Id.*) She performed the remaining multiplication and division within 100 goal with the desired 70% accuracy, but required "moderate teacher assistance"—specifically, she needed "prompting in order to solve multi-step multiplication and division problems." (*Id.*) The report noted that "[t]his skill should continue to be addressed next year." (*Id.*)

Speech-Language: M.S. achieved two of her four speech-language goals during the year. (*Id.* at 6.) She achieved her goal to "comprehend speech presented at an average rate of utterance," which required 8 out of 10 trials over eight weeks via biweekly structured observations. (*Id.*) She also achieved her vocabulary goal, which required 80% success over eight weeks via bi-weekly structured observations. (*Id.*) M.S. did not achieve her goal of describing the details and main idea of orally-presented material. (*Id.*) She "continue[d] to make gradual progress toward" achieving this goal, but it "ha[d] not yet been achieved independently;" rather, "[s]he requires scaffolding of information and moderate verbal prompting to guide her to

the appropriate response." (*Id.*) M.S. also did not achieve her goal of formulating grammatically correct sentences and maintaining appropriate verb tense in oral communication. (*Id.*) However, M.S. "[was] able to formulate grammatically correct sentences when provided with moderate support." (*Id.*)

Motor Skills: Finally, in motor skills, M.S. achieved three of her four goals. (*Id.* at 7.)[23] She achieved her upper body strength goal, her fine motor skills goal, and her handwriting goal, each of which required 90% accuracy over four weeks via monthly assessments. (*Id.*) However, she did not achieve her "far point copying skills" goal, functioning at approximately 60%. (*Id.*) Specifically, the report noted that she "had difficulty focusing on the material that need[s] to be copied from the board," "[h]er far point copying is extremely slow," and "[s]he works better if each line is of a different color." (*Id.*) The desired accuracy was 90% over four weeks. (*Id.*)

Based on this information, the Court disagrees with Plaintiff's characterization of the SRO's analysis of the progress report. (*See* Pl.'s Mem. 17–18.) First, whether M.S. achieved the goals set forth in the June 2014 IEP is not the controlling issue; rather, it is her *progress* toward achieving them. The IEP annual goals provide a measurable benchmark of M.S.'s overall progress during the 2014-15 school year. As shown above, while she did not achieve all of her goals, M.S. made progress in every category listed in the IEP. Second, even adhering to Plaintiff's interpretation that a goal was not achieved if it required teacher assistance, the report

---

[23] Plaintiff argues, for the first time in her reply brief, that M.S. already achieved these same goals by the end of the 2013-14 school year, as reflected in her progress report for that year, the criteria had only slightly changed for the 2014-15 year. (Pl.'s Reply. 4 & n.4 (citing Pl.'s Ex. GG-5).) Even if the Court were to consider this new argument, it does not undermine the conclusion that M.S. achieved the motor skills goals set forth in her June 2014 IEP. Indeed, the fact that the June 2014 IEP made the criteria more difficult to satisfy, and M.S. still achieved these goals, seems to indicate that she progressed in that year. Absent further explanation, the Court does not understand why the SRO should have considered this goal to be not achieved or achieved only with "strings attached." (Pl.'s Reply 4 (italics omitted).)

shows that M.S. accomplished a majority of her goals with no additional support.  (Def.'s Ex. 3 at 2–7 (indicating that M.S. achieved ten of her seventeen goals independently, with no teacher assistance indicated).)  Moreover, as noted, even where M.S. did not achieve a goal, the report indicates that she made *progress* toward it.

The SRO cited other evidence in the record to support this conclusion.  For example, M.S.'s 5th Grade Progress Profile, discussed briefly above, showed that while M.S. was below benchmark expectations in reading for each trimester, she still made overall progress.  (SRO Decision 25–26 (citing Pl.'s Ex. HH).)  Specifically, the report indicated M.S. made improvements on three reading tests administered at the beginning, middle, and end of the school year: (1) DIBELS, which measures fluency or, the number of words M.S. could read correctly per minute, (2) DAZE, which measures reading comprehension, and (3) Reading A-Z, which measures grade reading level based on comprehension performance.  (Pl.'s Ex. HH-1; Tr. 752–56.)  As the SRO explained, M.S. increased the number of words she could read correctly per minute on DIBELS, her reading comprehension improved on the DAZE, and she ended the school year at an end of second grade reading level ("O") after beginning at a first grade ("I") level and moving to a second grade ("K") level by mid-year.  (SRO Decision 25–26 (citing Pl.'s Ex. HH-1; Pl.'s Ex. II-1; Tr. 756, 770).)  The SRO concluded that the report showed M.S. "made at least approximately one year's progress," which constituted "progress meaningful for [her], particularly in light of her reading difficulties."  (*Id.* at 26 (citing Pl.'s Ex. Q-5; Pl.'s Ex. JJ-8–JJ-9.)[24]

---

[24] Plaintiff argues that these cited exhibits do not say "whether [M.S.] could not progress given her reading difficulties."  (Pl.'s Reply 5 n.5.)  True.  But, these sources do establish that M.S. has documented reading skill deficiencies.  (Pl.'s Ex. Q-5 (noting M.S.'s below-average performance in several reading tests); Pl.'s Ex. JJ-8 (discussing her WIAT-III reading skills score as "Below Average").)

Plaintiff argues that the SRO erred in interpreting these scores as progress, because M.S. was still "well below benchmark" on DIBELS and DAZE and M.S.'s Reading A-Z score was still "at least three grades behind" at the end of fifth grade. (Pl.'s Mem. 17; Pl.'s Reply 4–5.) Plaintiff focuses on grade-level comparisons because, as she correctly notes, the CSE determined that M.S. could participate "in the same State and District-wide assessments of student achievement that are administered to general education students," although Plaintiff cites the wrong year's IEP. (Pl.'s Mem. 16 (quoting Pl.'s Ex. H-15); *see also* Pl.'s Ex. E-13 (June 2014 IEP stating the same).) This means that the June 2014 CSE determined that M.S. was not a "student[] with the most significant cognitive disabilities" and thus would not participate in any "[a]lternate assessments aligned with alternate academic achievement standards" for those students. 34 C.F.R. § 300.160(c); *see also* 8 N.Y.C.R.R. § 200.4 (setting requirements for IEP providing for alternative assessments). However, Plaintiff does not argue, let alone cite evidence, that DIBELS, DAZE, or Reading A-Z are district or state-wide tests such that Plaintiff should be performing alongside her fifth grade peers if she takes them. For example, Plaintiff does not argue that obtaining a score at or above benchmark level is required in order to pass fifth grade and begin sixth grade. *Cf.* § 300.160(d)(1) (explaining that an IEP team must be alerted if an alternate assessment would affect the student's ability to complete the requirements for a high school diploma). Indeed, the record evidence seems to indicate that at least Reading A-Z might not be. (*See* Tr. 755, (Sassano testifying that "Reading A to Z is an informal assessment"); Pl.'s Ex. HH-1 (listing M.S.'s score on the state ELA); Tr. 756 (Sassano testifying that the ELA was "a New York State test").) Moreover, that the CSE determined M.S. did not have "the most significant cognitive disabilities" does not mean it concluded she should be performing at grade-level on all tests. Rather, it means that M.S. was capable of taking those

tests. *See, e.g.*, *T.C. v. New York City Dep't of Educ.*, No. 15-CV-3477, 2016 WL 1261137, at *15 (S.D.N.Y. Mar. 30, 2016) ("Under the IDEA, alternate assessments are for the child who *cannot* participate in the regular assessment. . . . Testing requirements for special education students reflect a policy decision not to lower the standards for students with disabilities vis-à-vis general education students, but instead to accommodate their disabilities while holding them to the same standards." (alterations, citations, and internal quotation marks omitted)). Therefore, the fact that M.S. was not an alternate assessment student alone is not sufficient to show her below-benchmark performance indicates lack of progress under the 2014-15 IEP.

This conclusion makes sense, because M.S. was expected to perform below grade-level in light of her established educational history and disability. As explained earlier, Dr. Klein testified that a decreased percentile performance is likely for students that progress at a rate slower than their peers. (Tr. 1851–52.) It would be irrational to expect M.S. to suddenly begin reading at a fifth-grade level after a year, even with intensive supports from her IEP, when she began that year at a first-grade reading level, with well-below benchmark DIBELS and DAZE scores and well-documented reading difficulties. (Pl.'s Ex. E-5 ("[M.S.] still falls well below the benchmark for fourth grade."); Pl.'s Ex. HH-1 (beginning at first grade "I" level).) Rather, M.S.'s *progress* must be based on her "unique circumstances," which are not that of a child simply "receiving instruction in the regular classroom." *Endrew F.*, 137 S. Ct. at 996, 1001; *see also H.C.*, 528 F. App'x at 67 ("To the extent that [the] [p]arents argue that the gap between M.C. and her peers was growing in terms of reading ability, moreover, 'a child's academic

progress must be viewed in light of the limitations imposed by the child's disability.'" (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997))).[25]

Plaintiff also argues that the SRO erred in relying on the three DIBELS and DAZE scores because M.S's scores actually fluctuated monthly. (Pl.'s Mem. 17 (citing Pl.'s Ex. HH-3–HH-4); Pl.'s Reply 4.)[26] The cited documents are both "Progress Monitoring" charts for the DIBELS program. (Pl.'s Ex. HH-3–HH-4.) Sassano, who prepared the report in question, testified that "the benchmark was given three times a year to show any progress," while progress monitoring "is given to the student monthly to see if the child has made progress on a monthly basis." (Tr. 761.) The first document measures DIBELS progress, and noted the following words read and errors made in a minute, although the Court has added the three reported scores and benchmarks in bold for context:

> **September: 65 words read, 4 errors (benchmark 132)**
> October: 96 words read, 3 errors
> November: 84 words read, 2 errors
> December: 92 words read, 0 errors
> **January: 78 words read, 2 errors (benchmark 150)**
> February: 61 words read, 3 errors
> March: 70 words read, 5 errors
> April: 82 words read, 1 error
> May: 86 words read, 1 error
> **June: 103 words read, 2 error (benchmark 155)**

---

[25] Plaintiff argues that this was not appropriate progress in light of M.S.'s circumstances because she moved from a second to a fourth grade level in one year at Eagle Hill. (Pl.'s Mem. 17 (citing Pl.'s Ex. MM-1); Pl.'s Reply 5 (same).) This is odd, since Plaintiff chastises the SRO for allegedly relying on impermissible retrospective evidence. (Pl.'s Mem. 19.) In any event, the SRO decided only that, based on a variety of evidence, M.S. progressed in 2014–15. The Court asks only whether that decision was actually supported by the evidence. Thus, the Court's decision is "necessarily prospective in nature [and] therefore, we must not engage in Monday-morning quarterbacking influenced by our knowledge of [M.S.'s] subsequent progress at [Eagle Hill]." *Viola*, 414 F. Supp. 2d at 382. Plaintiff cites no case to the contrary.

[26] Plaintiff did not raise this argument before the IHO, and it is therefore difficult for the Court to conclude that the SRO erred in not addressing it. (*See* IHO Ex. VI at 8–9.)

(Pl.'s Ex. HH-3; Tr. 761–63.)  The second document measures DAZE progress, and reported the following scores in choosing the best word out of three that fits in a sentence, although the Court again has added the three reported scores and benchmarks in bold for context:

> **September: 8 (benchmark 21)**
> October: 21
> November: 20
> December: 23
> **January: 11 (benchmark 25)**
> February: 15
> March: 20
> April: 15 [27]
> May:  17
> **June: 17 (benchmark 32)**

(Pl.'s Ex. HH-4; Tr. 763–67.)[28]  Plaintiff is correct that M.S.'s scores fluctuated throughout the year.  And, one could argue that such fluctuation implies inconsistent progress.  However, Plaintiff cites no law for the proposition that such fluctuations undermine a finding that because the end of year score is higher than the initial score, M.S. showed progress.  Indeed, Basile testified that the DIBELS benchmark is used to "drive[] instruction," and "as a gauge" to adjust the intensity of instruction, but that a below benchmark score is "not necessarily a low performance."  (Tr. 870–72.)  Rather, the District "look[s] at patterns of errors and . . . gains and . . . [they] look at tremendous gain even though it's below benchmark those gains were made."  (*Id.* at 872.)  So, for example, M.S. "went down in her errors and she went up in her accuracy and . . . in the words correct per minute in which she read," which constitutes "a huge jump from

---

[27] Sassano testified that this April box said 15 with 3 errors, (Tr. 765–66), but, as the IHO noted, this box is illegible on the document copy itself, (Tr. 766 ("I can't read anything on April.")); Pl.'s Ex. HH-4).

[28] Sassano testified that there is an "adjusted score" and also that "each error is a half a point."  (Tr. 764.)  She testified that the scores on the DAZE "Progress Monitoring" chart showed both adjusted score and error, but did not specify whether the reported benchmark scores were adjusted, or just the raw scores without errors.  (*Id.*)

September to January." (*Id.*)  Thus, although Plaintiff is correct that M.S. was below benchmark

for both DIBELS and DAZE at all three reporting dates—and indeed, she actually declined in

performance relative to the DAZE benchmark on those dates—her scores did increase over the

year, and at least for DIBELS, her errors went down.  (Pl.'s Ex. HH-3–HH-5.)  Moreover,

standardized test scores are not necessarily dispositive of the question of progress.  *See H.W. v.*

*New York State Educ. Dep't*, No. 13-CV-3873, 2015 WL 1509509, at *17 (E.D.N.Y. Mar. 31,

2015) (deferring to SRO's decision stating that "even assuming that the [standardized] tests

showed minimal progress, the hearing record as a whole supports the conclusion that the student

made meaningful progress"); *Gavrity v. New Lebanon Cent. Sch. Dist.*, Nos. 05-CV-1024, 06-

CV-317, 2009 WL 3164435, at *31 (N.D.N.Y. Sept. 29, 2009) (concluding that "[t]he record

supports the SRO's finding" that, although the student's "performance on the standardized tests

was 'inconsistent' and . . . he did not meet objectives," other "assessment tools . . . show[ed]

progress in his identified areas of need"); *see also E.S. ex rel. B.S. v. Katonah-Lewisboro Sch.*

*Dist.*, 487 F. App'x 619, 622 (2d Cir. 2012) (affirming district court's conclusion that a child

made progress "despite his low test scores").  Therefore, in light of the absence of any law or

evidence suggesting that the Court should interpret M.S.'s score fluctuations differently, and

because "assessment of educational progress is a type of judgment for which [the Court] should

defer to the SRO's educational experience, particularly where" the Court is reviewing the same

"record that was before the SRO," *M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the*

*City of Yonkers*, 231 F.3d 96, 105 (2d Cir. 2000), *abrogated on other grounds*, *Schafer v. Weast*,

546 U.S. 49 (2005),[29] the Court does not find the SRO's finding of progress, based on other objective evidence in the record, to be erroneous solely on this ground.[30]

Other such objective evidence included the May 2015 IEP and related testimony from M.S.'s instructors, which similarly indicated progress throughout the 2014-15 school year. (SRO Decision 26-27.) Academically, the SRO noted that M.S. had "exhibited 'gradual progress toward her writing goals'" and that her handwriting "showed 'nice improvement'" throughout the year. (*Id.* at 26 (quoting Pl.'s Ex. H-6).) In math, the SRO noted that M.S. had learned to add and subtract with regrouping and multi-digit whole numbers and decimals. (*Id.* (citing Ex. H-7).) Sassano testified that Plaintiff's multiplication and division skills also improved. (*Id.* (citing Tr. 364–65).) Physically, M.S. had greatly improved her far point copying skills. (*Id.* at 26–27 (citing Pl.'s Ex. H-7, H-9).) The occupational therapist similarly testified to M.S.'s progress during the 2014-15 school year. (*Id.* at 27 (citing Tr. 629–30).) The SRO also cited testimony by District employees who worked with M.S. indicating that M.S. had made great strides socially, as reflected in her IEP. (*Id.*) Specifically, by the end of the 2014-15 school

---

[29] More recent caselaw suggests that deference is less warranted when the SHO's determination concerns "whether there have been objective indications of progress," but it does not state that such determinations are owed *no* deference, particularly when supported by other objective evidence and based on the same record before the Court. *M.H.*, 685 F.3d at 244.

[30] Plaintiff also argues that the SRO only reported M.S.'s "standard scores, instead of the percentile ranking" on the WIAT-III test, "which made it more difficult to see [M.S.'s] decline." (Pl.'s Mem. 18.) Plaintiff does not provide a citation, so it is unclear where the SRO did this. To the extent that Plaintiff is referring to the portion of the decision where the SRO compared M.S.'s March 2012 and December 2014 WIAT-III scores, (SRO Decision 22), she did so in the context of Plaintiff's argument regarding the January 2015's denial of a FAPE, not her conclusion that M.S. made progress overall during the 2014-15 school year, (*id.* at 20). In any event, the scores, and their portrayal as decreases, was completely accurate. (*Compare* Pl.'s Ex. DD-5 *with* Pl.'s Ex. JJ-18.) Moreover, as explained above, Plaintiff does not cite any law showing that this would undermine the conclusion, drawn from other objective evidence, that M.S. progressed.

year, M.S. was demonstrating greater self-confidence, participating more in class, and building relationships with peers. (*Id.* (citing Tr. 198, 200–02, 933–35, 965; Pl.'s Ex. H-8).)

Plaintiff argues, for the first time in her reply brief, that the SRO should not have relied on this testimony, because "District employees provided subjective and selective testimony that [M.S.] 'progressed.'" (Pl.'s Reply 3.) However, the Court has independently reviewed the record and concluded that it supports the SRO's conclusion. Moreover, the SRO provided an explanation for relying on this testimony: it was from people who worked with, and thus were able to observe, M.S. on a daily basis, which even the Plaintiff's expert evaluator indicated was important. (SRO Decision 28 (emphasizing that they "worked with [M.S.] on a day-to-day basis"); *id.* at 28 n.17 ("The private neuropsychologist . . . responded affirmatively that it was important for an evaluator to know how a child performs in their day-to-day performance relative to how they performed on standardized assessment." (citing Tr. 1711)).) And, the SRO did not rely *exclusively* on this testimony; rather, the SRO primarily cited it for context and elaboration on other sources of information. (*See, e.g.*, SRO Decision 26 ("[D]uring the impartial hearing, [M.S.'s] special education teacher and related service providers elaborated on [M.S.'s] progress.").) Plaintiff cites no case requiring reversal of an SRO's decision merely for relying on allegedly subjective testimony, and therefore the Court will not do so on this basis.

Finally, Plaintiff argues that the SRO improperly dismissed Dr. Dorta's testimony, which was the only expert testimony at the IHO hearing and was based on objective data, that M.S. did not progress. (Pl.'s Mem. 18.) As an initial matter, to the extent Plaintiff is arguing that the SRO rejected Dr. Dorta's testimony without providing a basis for doing so—such as contrary evidence—this is flatly contradicted by the SRO's decision. (SRO Decision 24 (emphasizing that "other indications of student progress contained in the hearing record" contradicted Dr.

Dorta's report, which the IHO relied exclusively on); *id.* at 28 n.17 (noting that Dr. Dorta never observed M.S., which he admits was important to understand standardized results); *see also id.* at 23–28 (devoting several pages to discussing the evidence of progress in the record).)  Therefore, the cited case, which is in any event a non-precedential summary order, is inapposite.  *See J.C. v. Katonah-Lewisboro Sch. Dist.*, 690 F. App'x 53, 55 (2d Cir. 2017) ("The SRO was not required to automatically accept the neuropsychologists' recommendations as to class size, but he was required to consider the recommendations and, if he rejected them, to convincingly explain why.").  Moreover, the SRO was not required to accept Dr. Dorta's testimony merely because he was an "expert" or because the IHO relied on it.  *See G.W. v. Rye City Sch. Dist.*, No. 11-CV-8208, 2013 WL 1286154, at *19 (S.D.N.Y. Mar. 29, 2013) ("The Court is not at liberty to favor Dr. Scalzo's opinion, a privately hired expert, over the deference that should appropriately be accorded to the District in matters of educational policy."), *aff'd*, 554 F. App'x 56 (2d Cir. 2014); *McCallion v. Mamaroneck Union Free Sch. Dist.*, No. 10-CV-6207, 2013 WL 237846, at *10 (S.D.N.Y. Jan. 22, 2013) (rejecting argument that "the SRO erred by relying too heavily on the evaluations and opinions of the District's witnesses while giving little or no weight to the conclusions of Parent's experts" because the court defers to the district, not to a private expert); *Watson ex rel. Watson v. Kingston City Sch. Dist.*, 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004) ("The mere fact that a separately hired expert has recommended different programming does nothing to change this [outcome], as deference is paid to the District, not a third party.") *aff'd*, 142 F. App'x 9 (2d Cir. 2005).

In any event, Dr. Dorta's report and testimony do not undermine the SRO's conclusion that there were objective indications of meaningful progress in the record.  In his report, Dr. Dorta stated:

Comparison of the data from 03-12 to present and including her TONYSS shows that [M.S.] is not progressing. Real progress equates to an upward movement of the percentile ranks in core academic areas. No such evidence of upward progression is seen and on the contrary, either her historical trajectory is maintained such as in reading, or decline is noted (math computation).

(Pl.'s Ex. Q-6.)[31]  It is not clear what "data" he is referring to, but at the very least, TONYSS is the "Tests of New York State Standards," *see* New York State Education Department, "Acronyms," http://www.nysed.gov/about/acronyms/T, which Plaintiff never cites to or describes in any way.  Dr. Dorta's testimony suggested that he looked at other data, such as academic reports and previous evaluations, as well.  (Tr. 1711–14.)  More importantly, Dr. Dorta seems to be relying solely on standardized testing data and defines progress in a very narrow way: "upward movement of the percentile ranks in core academic areas."  (Pl.'s Ex. Q-6.)  The Court explained above why testing and percentiles are not dispositive of progress for IDEA purposes.

Plaintiff argues that "the SRO should have deferred to the IHO on his findings of witness credibility."  (Pl.'s Mem. 18.)  But, the SRO did not find Dr. Dorta not credible; he simply found other measures of objective evidence of progress in the record.  (SRO Decision 24, 27–28.)  Moreover, Plaintiff cites no testimony that the SRO overlooked.  Perhaps this is because the IHO cited Dr. Dorta's testimony only once—when he testified what a "language intensive program" means.  (IHO Decision 21 (citing Tr. 1371).)  Absent any further explanation from Plaintiff about how Dr. Dorta's testimony undermined the other evidence cited by the SRO, or any caselaw suggesting that his expert status alone should be given more weight, the Court agrees

___

[31] The IHO also found that Dr. Dorta's report indicated that M.S.'s ADHD "was contributing to [her] poor academic progress," (IHO Decision 21), but this does not establish that Plaintiff did not progress meaningfully during the 2014–15 school year.

with the SRO's well-reasoned decision that, as a whole, the record shows M.S. progressed during the 2014-15 year.  (SRO Decision 27–28.)[32]

### b.  May 2015 IEP

Plaintiff argues that Defendant failed to provide M.S. with a FAPE for the 2015-16 school year.  (Pl.'s Mem. 19–21.)  First, Plaintiff argues that Defendant "was required to modify" M.S.'s IEP by adding more intensive services than offered during the 2014-15 school year, because M.S. did not make meaningful progress that year.  (*Id.* at 19–20.)  However, as explained above, M.S. did demonstrate such progress in the 2014-15 school year.  Therefore, Defendant did not fail to offer a FAPE merely because it continued any recommendations from the June 2014 IEP.

Construing Plaintiff's argument generously, she is asserting that the IHO correctly found that the May 2015 IEP was "virtually identical" to the June 2014 IEP," (IHO Decision 23), and instead added only "a reading class two days per week," which was not reasonably calculated to allow M.S. to progress, (Pl.'s Mem. 19).[33]  The SRO concluded otherwise, and identified a

---

[32] Plaintiff also argues that the SRO should not have considered building level reading services which were not in the IEP.  (Pl.'s Mem. 19.)  The cited portions of the SRO's decision are not in the section regarding whether M.S. made progress during the 2014-15 school year.  (SRO Decision 21, 23.)  In any event, the Court addressed this argument above, concluding that the SRO explicitly did *not* rely on those services in its analysis.  (*See supra* n.18.)  Moreover, the Court's task is only to "examine the record for any objective evidence" of progress, not to ask whether the SRO relied on some impermissible evidence in coming to its conclusion.  *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998) (internal quotation marks omitted); *see also K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, 530 F. App'x 81, 85 (2d Cir. 2013) (explaining that the question before the court "is not whether the SRO relied on impermissible retrospective evidence, but whether sufficient permissible evidence, relied on by the SRO, supports the SRO's conclusion that the IEP offered [the student] a reasonable prospect of educational benefits" (italics omitted)).

[33] The Court is not sure where this "reading class two days per week" comes from.  (Pl.'s Mem. 19.)  Plaintiff does not cite a provision of the IEP, and the IEP clearly recommends a special reading class *daily*.  (Pl.'s Ex. H-1, H-12; *see also* Pl.'s Mem. 25 ("Appx. 1").)

number of differences between the two IEPs, including the listed classes and ratios, annual goals, duration of related services, and supplementary services and testing accommodations. (SRO Decision 28-31.) The Court will not describe all of the ways in which the 2014 IEP and May 2015 IEP differ, as the SRO's decision thoroughly does so and Plaintiff fails to address any of these differences. However, a comparison of the two IEPs shows that the CSE conducted a thorough review of M.S.'s then-current levels of performance and made recommendations based on that information in the May 2015 IEP.[34] (*Compare* Pl.'s Ex. E *with* Pl.'s Ex. H.) Deferring to the well-reasoned conclusions of the SRO as the final state administrative decision, the Court finds that the record supports her determination that the May 2015 IEP was reasonably calculated to provide M.S. with a FAPE.

Plaintiff argues that Dr. Dorta's recommendations required more intense reading-based intervention and a small group (three to six students) for math and writing. (Pl.'s Mem. 20). This argument fails. First, the SRO credited the testimony of school psychologist Jessie Wallace, indicating that the IEP's recommendations comported with Dr. Dorta's recommendations. (SRO Decision 30–31; Tr. 1052–54 (testifying that the IEP "align[ed] with . . . and in some areas even exceed Dr. Dorta's recommendations," and that the provision of "an intensive special class program" satisfied his recommendation); *id.* at 1059, 1069–75 (math); *id.* at 1057–59 (double block for ELA), 1065–66 (reading); *id.* at 1077–78 (writing).) To the extent that these experts disagree, the Court may not choose between them and disrupt the SRO's decision. *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (noting

_____

[34] In addition to the information it reviewed during its January 2015 meeting, the CSE relied on two new sources of information in developing the May 2015 IEP—a March 2015 social history update and the results of the March 2015 private neuropsychological examination by Dr. Dorta. (Pl.'s Ex. H-1–H-3.)

that a district court may not "impermissibly ch[o]ose between the views of conflicting experts on a controversial issue of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence" (alteration and internal quotation marks omitted)).

Furthermore, Dr. Dorta's report does not support Plaintiff's argument. The report recommends "reading comprehension intervention in a small group, double block period daily using a hybrid model targeting decoding, oral fluency, and reading comprehension." (Pl.'s Ex. Q-7.) This should include "developing a step-wise approach to reading passages and encoding important information" and "problem-solving during reading." (*Id.* at Q-8.) As to the size of the small group, Dr. Dorta cited the "average" noted in "most research studies," which is groups "from three to six." (Tr. 1351.) The May 2015 IEP satisfied these recommendations. First, it recommended that M.S. move from the 12:1+1 reading class to the 5:1 reading class. (Pl.'s Ex. H-1, H-12.) And, the IEP set forth six annual reading goals, increasing the criteria for the previous two reading goals (fluency and comprehension) and adding four new goals to target M.S.'s needs with respect to decoding and encoding multisyllabic words, vocabulary, syllabication, and higher-level reading comprehension. (*Compare* Pl.'s Ex. E-9 (listing 2 reading goals) *with* Pl.'s Ex. H-10–H-11 (listing 6 reading goals).) These goals were developed based on the reading teacher's observations of M.S. and her below benchmark scores. (Tr. 257–258, 803–04). Plaintiff does not cite anything in the record requiring more specific interventions, nor does she cite any testimony from Dr. Dorta indicating that the IEP was insufficient.

Dr. Dorta's report also recommends "small group support in writing and mathematics" three times weekly. (Pl.'s Ex. Q-7.) When asked about the size of the group for math, Dr. Dorta testified that because M.S.'s "skills are so behind for a fifth grader that she would need to be

paired with another student" with similar deficiencies, and because "[i]t's just hard to find that many fifth graders that are that behind in mathematics," it could be "three, four, five kids." (Tr. 1350–51.) He also recommended that the math small group should work on "both improving more complex computations with subtraction, multiplication, and division," as well as "helping [M.S.] deconstruct word problems." (Pl.'s Ex. Q-9.) The instruction should "be concrete and should use manipulatives." (*Id.* (emphasis omitted)) The May 2015 IEP did not recommend a group of three to five students; rather, it recommended continuing M.S.'s 12:1+1 special class, but increased the duration by 2 minutes. (*Compare* Pl.'s Ex E-10 *with* Pl.'s Ex. H-12.) However, the only cited evidence regarding a three to five student number is from Dr. Dorta's testimony, which is based on likely availability of comparable students in math skills, not any identified need for that number based on M.S.'s needs. Indeed, Dr. Dorta testified that, by recommending a "small group" for reading, math, and writing, he meant that M.S. should not be placed in "a traditional mainstream classroom." (Tr. 1348–49.) The CSE acknowledged this, noting that M.S. "has made satisfactory progress towards her math goals," but also found that she sometimes "needs to be refocused" during lessons and that she benefits from "working in a small group" and visual aids. (Pl.'s Ex. H-7.)

In any event, the remainder of the IEP addresses Dr. Dorta's other recommendations regarding math content. The CSE found that M.S. "has yet to memorize her basic math facts, which greatly affects her ability to perform computations with accuracy," and that "[m]ulti-step processes such as long division" and word problems pose difficulties for her. (*Id.*) The IEP thus set forth three math goals for higher-level multiplication, division, and problem solving, (Pl.'s Ex. H-11), which comport with Sassano's testimony regarding M.S.'s work, (Tr. 259–60). The IEP also listed a multiplication table as a supplementary aid. (Pl.'s Ex. H-14.) Because Plaintiff

cites no other evidence in the record requiring more math support, and because the SRO determined that the IEP was reasonably calculated to allow M.S. to progress in math based on objective evidence in the record, the Court defers to this conclusion.

For writing, Dr. Dorta did not testify regarding the size of the recommended small group in the cited portions of the hearing transcript, and Plaintiff cites no other evidence requiring such a group size. (*See* Pl.'s Mem. 20 (citing Tr. 1346–54).) However, Dr. Dorta recommended "integrated reading and spelling work," as well as "extensive review of the basic grammar of sentence development" and teaching "a structure for responding in writing." (*Id.* at Q-10.) Again, the IEP aligns with these recommendations. The IEP set forth three annual goals for spelling, development, and capitalization and punctuation, all of which were stricter and more specific than the June 2014 IEP's writing goals. (*Compare* Pl.'s Ex. H-11 *with* Pl.'s Ex. E-9.) This comports with the CSE's finding that M.S. "has made gradual progress toward her writing goals" but still needs "moderate to intensive support depending on her interest in the topic," so she "needs to be encouraged to add more details and facts," as well as to check spelling, mechanics, capitalization, and grammar. (Pl.'s Ex. H-6.) Sassano testified that these goals were intended to get M.S. to "raise the bar" from writing more than one paragraph with moderate support and to work on "revising and editing" independently. (Tr. 258–59.) Similarly, M.S.'s speech-language pathologist testified that she recommended that her grammar goal be modified to be "slightly more intensive," (Tr. 532–33), and that a goal should be added to address M.S.'s need to use categorization, classification, and association to improve her vocabulary to a sixth grade level, (*id.* at 535–36). The CSE also continued or increased its recommendations for additional aids, accommodations, and modifications, (Pl.'s Ex. H-13–H-14), including adding that M.S. have computer access in order to record longer writing assignments, (*compare* Pl.'s Ex.

E-11-12 *with* Pl.'s Ex. H-14.)  Because Plaintiff addresses none of these aspects of the IEP, all

cited in the SRO's decision, and because she cites no other objective evidence requiring a small

group of three to six students for math, the Court agrees that the May 2015 IEP was reasonably

calculated to permit M.S. to progress in math.

Finally, Plaintiff argues that the IEP was insufficient because it failed to recommend

"using research-based reading interventions such as Orton[-]Gillingham."  (Pl.'s Mem. 20; *see*

*also* Pl.'s Reply 7.)  As explained above, Orton-Gillingham is an instructional approach that is

multisensory, explicit, repetitive, and sequential.  (Tr. 1371.)  *See Viola*, 414 F. Supp. 2d at 384.

The IEP specifically lists "Multi-Sensory Approach" as a supplementary aid and service for

M.S., to be used daily during instructional time.  (Pl.'s Ex. H-13; *see also id.* at H-7–H-8 ("M.S.

requires frequent re-teaching and reinforcement activities" for math and "is a visual learner and

benefits from manipulatives" and needs "much review and repetition"); *id.* at H-9 (requiring

"positive reinforcement").)  To the extent Plaintiff is arguing that the IEP is defective for failing

to *specify* a particular "educational methodology" or peer-reviewed method, this argument fails

for the reasons explained earlier with respect to the June 2014 IEP.  *See K.L.*, 2012 WL

4017822, at *12 (regarding teaching methodologies); *Jenn-Ching Luo*, 2012 WL 728173, at *5

(regarding "citations to peer-reviewed academic literature").  Plaintiff argues that the CSE

refused to specify what teacher would use this multi-sensory approach or whether M.S.'s

teachers were trained in Orton-Gillingham, but cites no case requiring the CSE to do this to

comply with the IDEA.  (Pl.'s Mem. 20 (citing Tr. 1152–53); *see also* Tr. 1954.)  Indeed, the

Second Circuit recently suggested that it need not do so.  *See Mr. P*, --- F.3d ---, 2018 WL

1439719, at *14 (rejecting the plaintiff's argument that "the [d]istrict was required to provide

them with the specific qualifications of the paraprofessionals" that would work with the student

and explaining that "the appropriate inquiry is into the nature of the program actually offered in the written plan" (alteration, emphasis, and internal quotation marks omitted)). In any event, there is evidence in the record that teachers in the District were certified in and used Orton-Gillingham with M.S., and even that the District hoped to use Orton-based assessments for M.S.'s reading. (*See* Tr. 787-89 (Basile describing that "visual, kinesthetic, and auditory" instruction that M.S. received in the classroom and in supplemental reading class qualified as "multi-sensory instruction in reading"); *id.* at 806 ("I would use an Orton-based assessment to understand what [M.S.] is understanding [with respect to phonemic awareness]."); *id.* at 827–28 (Basile testifying that she uses Orton-Gillingham "daily in [her] teaching practices"); *id.* at 830–35 (Basile testifying that she uses Orton-Gillingham in reading services but not a "specific program").)

Moreover, Dr. Dorta's "recommendation" is not as clear as Plaintiff purports it is. As explained earlier, Orton-Gillingham is not mentioned in Dr. Dorta's report. (Pl.'s Ex. Q.) Nor do the cited pages of the hearing transcript indicate that Dr. Dorta thought Orton-Gillingham was *required* for M.S. to progress in reading. (*See* Tr. 1346–54.) Dr. Dorta testified that M.S. needed a "hybrid model" for reading that "target[s] her ability to decode, her fluency and her reading comprehension," which, as explained above, the IEP recommended. (Tr. 1346.)[35] Specifically, Dr. Dorta recommends "targeting her language difficulties," because M.S.'s "reading comprehension difficulties primarily stem from her language deficits." (*Id.* at 1347.) Plaintiff does not contest the SRO's finding that the IEP's continuation of M.S.'s small group speech/language therapy—5:1 twice a week and 2:1 once a week—but with increased duration

---

[35] Indeed, Dr. Dorta's testimony regarding her recommended "hybrid model" seems to indicate that a "pure" Orton Gillingham approach is not warranted. (Tr. 1346.)

was reasonably calculated to promote M.S.'s progress in speech and language.   (Pl.'s Ex. H-13;

SRO Decision 30.)  Without delving into credibility issues or weighing the competing testimony,

the Court concludes only that the evaluative materials before the May 2015 CSE did not "yield a

clear consensus" that M.S. required Orton-Gillingham instruction such that the IEP's failure to

include it violated the IDEA or that the SRO's decision is not entitled to deference.  *A.M.*, 845

F.3d at 543.

     In any event, the SRO was not required to accept the recommendation of Dr. Dorta that

Orton-Gillingham must be used.  As explained earlier, the IEP is not rendered substantively

inadequate merely because it did not incorporate Dr. Dorta's recommendations.  *See Watson*, 325

F. Supp. 2d at 145 ("The mere fact that a separately hired expert has recommended different

programming does nothing to change this, as deference is paid to the District, not a third party.");

*G.W.*, 2013 WL 1286154, at *19 ("The Court is not at liberty to favor Dr. Scalzo's opinion, a

privately hired expert, over the deference that should appropriately be accorded to the District in

matters of educational policy.").  And, because this issue "involve[es] a dispute over an

appropriate educational methodology," the Court must defer to the SRO's well-reasoned

decision.  *M.H.*, 685 F.3d at 244; *see also T.Y.*, 584 F.3d at 418 (explaining that the Court may

not choose between conflicting experts on issues of educational policy when the SRO has

already chosen based on the same evidence).  Therefore, the Court concludes that the May 2015

IEP did not violate M.S. a FAPE for the 2015-16 school year.  *See Endrew F.*, 137 S. Ct. at 1000

("The IDEA . . . requires an educational program reasonably calculated to enable a child to make

progress appropriate in light of the child's circumstances.").[36]

---

[36] Plaintiff also asserts in passing that Defendant "failed to recommend sufficient
social/emotional support to address M.S.'s significant issues."  (Pl.'s Mem. 20.)  To the extent
this relates to the allegations of bullying, causing M.S. to "cry[] every day," (*id.*), the Court

4.  Bullying

Finally, Plaintiff argues that Defendant denied M.S. a FAPE by failing to respond

appropriately to bullying.  (Pl.'s Mem. 21–22.)[37] The Second Circuit has not decided when the

failure to address bullying in a student's IEP results in a substantive denial of a FAPE.  *See T.K.*

*v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 876 & n.3 (2d Cir. 2016).  However, it has noted that the

Department of Education believes "bullying can interfere with a disabled student's ability to

receive a FAPE."  *Id.* at 876.  (*See also* Pl.'s Mem. 21 (citing letter from the office of Special

Education Programming stating the same); SRO Decision 31–32 (same).)  Even assuming this

accurately states the law, Plaintiff's claim fails.

Both the IHO and the SRO determined that Plaintiff's claim that Defendant failed to

provide M.S. a FAPE by not developing an anti-bullying plan for the 2013-14 and 2014-15

school years was without merit.  (IHO Decision 26–27; SRO Decision 32–35.)  Both the IHO

and the SRO found that the District quickly and adequately addressed all instances of alleged

bullying of which it was aware.  (IHO Decision 26–27; SRO Decision 33, 35.)  The SRO

specifically went through all of the alleged incidents in detail, and based her decision largely on

testimony of Plaintiff, school officials, and the contents of M.S.'s IEPs.  (SRO Decision 32–35.)

The Court will not go through all the SRO's thorough findings, because Plaintiff addresses none

of them.

---

addresses that claim below.  However, if this argument relates to the IEP's provision of
counseling, Plaintiff does not explain what more was required beyond the small group
counseling M.S. was given every day,  (Pl.'s Ex. H-13), which the SRO discussed in detail,
(SRO Decision 29).

[37] Again, to the extent this relates to dates prior to December 22, 2013, this claim is time-
barred.  (*See* Pl.'s Mem. 22 ("[M.S.] suffered from bullying the entire time she was in the
District.").)

The only incidents Plaintiff mentions are (1) generic bullying and exclusion because of M.S.'s Tourette's syndrome; (2) M.S.'s crying at home after school; and (3) daily bathroom incidents. (Pl.'s Mem. 21–22 (citing Tr. 950, 1907–08); Pl.'s Ex. SS-1.)[38] The first allegation is not specific enough to establish severe bullying that should have been addressed in an IEP—Plaintiff provides no details in her brief, and her cited testimony is a generic statement that during the 2013–14 school year, "[k]ids thought that [M.S.] was rolling her eyes at them," and would say "why are you doing that, you are freaking me out, stop doing that." (Tr. 1907.)[39] The June 2014 CSE specifically acknowledges this issue, stating:

> Due to the Tourette's Disorder, her tic behaviors can look like inappropriate responses to comments or social interactions but they are definitively tics and need to be ignored. This behavior is much less evident in school this year. Tics are seen more at home. [M.S.] needs support in social situations where tic behaviors may affect responses from other children.

(Pl.'s Ex. E-7.) The CSE noted that M.S. "has been participating in a social skills group at the building level," but concluded that "[t]here are no social and emotional needs that should be addressed through special education, at this time." (*Id.*) Indeed, the IEP indicated that M.S. was well liked by her classmates. (*Id.*) Plaintiff cites no evidence that any teasing from display of Tourette's symptoms—which Plaintiff testified, in accordance with the CSE's findings, had decreased in fourth grade, (Tr. 1908)—interfered with her educational progress. Nor does

---

[38] To the extent Plaintiff had other bullying claims, she waived them by failing to raise them distinctly in either of her briefs. *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) ("[The plaintiff] failed to . . . raise this argument in his opposition to summary judgment. Thus, this argument has been waived.")

[39] Plaintiff testified that she told three people—Mr. Pastore, the general education teacher, Mrs. Frattarola, the special education teacher, and Dr. Klein, the school psychologist—about this at a parent teacher conference, but she also told them that they had changed M.S.'s medication and "would like them to monitor it to see if it was lessening [] the tics." (Tr. 1908; *see also id.* at 97.)

Plaintiff explain why the building level social skills group was insufficient, or why social services needed to be in her IEP for the 2014-15 school year. Thus, the SRO's conclusion that the June 2014 IEP adequately dealt with M.S.'s social needs was well supported by the record. (SRO Decision 34.)

Plaintiff's argument regarding crying at home fares no better. Plaintiff does not identify when this occurred or what was triggering it, let alone how it interfered with M.S.'s ability to progress in the classroom. The cited Social History Update, dated March 11, 2015, indicates that at the January 2015 CSE meeting, Plaintiff stated that "while [M.S.] keeps herself together in school, she cries almost daily at home due to her struggles to get through school each day." (Pl.'s Ex. SS-1.) The IEP noted that M.S.'s teacher found M.S. to be integrated with her peers, (Pl.'s Ex. G-5), but still responded to Plaintiff's concerns by recommending small group counseling as a "related service," (*id.* at G-9). The CSE meeting minutes also noted that Plaintiff's social skills group should continue. (*Id.* at G-1.) Thus, to the extent that Plaintiff is arguing that the January 2015 IEP should have addressed M.S.'s crying from bullying, the Court agrees with the SRO's thorough analysis that it adequately did just that. (SRO Decision 33–34.)

Finally, Plaintiff's claim regarding the bathroom incidents also fails. The SRO considered all of the testimony on this issue and concluded that these incidents were the result of M.S.'s "desire to socialize with peers at lunch and recess" rather than bullying, but in any event, Defendant responded adequately. (SRO Decision 32–33.) Indeed, the SRO cited Plaintiff's own testimony that after Defendant instituted a plan so that M.S. would use the nurse's bathroom before lunch, these incidents stopped. (Tr. 2059 (testifying after the meeting with the District, and discussions at home, "it stopped"); *id.* at 2061 ("I don't know if it was because of the intervention . . . [but] [i]t did stop, obviously.").) To the extent Plaintiff believes the SRO

improperly interpreted her testimony or found her not credible, the Court will not disrupt the SRO's decision. *See W.M. ex rel. V.M. v. Bd. of Educ. of Harrison Cent. Sch. Dist.*, No. 16-CV-8732, 2017 WL 5157768, at *15–16 (S.D.N.Y. Nov. 6, 2017) (deferring to SRO and IHO decisions regarding bullying allegations in face of the plaintiff's argument that the SRO failed to consider his testimony), *appeal dismissed*, 2017 WL 8159198 (2d Cir. Dec. 22, 2017).[40] The same rule applies to any disputes Plaintiff has with the District staff's testimony that the SRO relied on regarding the bus incident, an incident in the community, and general treatment by other students at school. (SRO Decision 33–34.)

In sum, the Court agrees with the IHO and the SRO that M.S. did not suffer such severe bullying that Defendant's failure to address it in her IEP denied her a FAPE. *Cf. T.K.*, 810 F.3d at 875–76.

---

[40] Plaintiff also argues that the school counselor was not aware that M.S. was having bathroom incidents when she testified at the IHO hearing, nor was she invited to attend the January 2015 IEP meeting. (Pl.'s Mem. 22.) Absent more explanation, it is not clear why the school counselor needed to be informed if the incidents stopped. And, if she indeed was not informed, it is equally unclear why her presence was necessary at the IEP meeting. To the extent that Plaintiff disagrees with the counselor's assessment of "typical fifth grade behavior," it is irrelevant to the Court's review here. (*Id.*) However, as the SRO noted, the counselor did testify that the school did not receive reports that M.S. was being bullied. (SRO Decision 34.)

### III. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is denied.[41] The

Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 11), enter

judgment for Defendant, and close this case.[42]

SO ORDERED.

DATED:    March **30**, 2018
          White Plains, New York


KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[41] Because the Court denies Plaintiff's Motion and concludes that Defendant did not deny M.S. a FAPE for any of the specified years, it need not address Plaintiff's last argument: that she is entitled to reimbursement for Eagle Hill tuition for 2016-16 and compensatory services for the FAPE denials during 2013-14 and 2014-15. (Pl.'s Mem. 22–23.)

[42] Pursuant to the motion schedule suggested by Defendant—in which Plaintiff would file a summary judgment motion to which Defendant would respond, obviating the need for cross-motions for summary judgment—and to which Plaintiff did not object, the denial of Plaintiff's Motion is the equivalent of granting summary judgment to Defendant. (*See* Letter from Mark C. Rushfield, Esq. to Court (Feb. 10, 2017) (Dkt. No. 8); Order (Dkt. No. 9) (granting request).)